Olivia N. **SERDAREVIC** and The Estate of Bosiljka Serdarevic, Plaintiffs,

v.

**CENTEX HOMES, LLC,** Defendant.

Case No. 08–CV–5563 (KMK).

United States District Court, S.D. New York.

Sept. 30, 2010.

Olivia N. Serdarevic, Goshen, N.Y., pro se.

Deborah Jean Israel, Esq., Alida M. Dagostino, Esq., Womble, Carlyle, Sandridge & Rice, PLLC, Winston–Salem, N.C., for Defendant.

## OPINION AND ORDER

KENNETH M. KARAS, District Judge:

Plaintiffs bring this action alleging breach of three separate contracts. Defendant moves to dismiss the Third Count in the First Amended Complaint ("FAC"). For the reasons contained herein, Defendant's Motion is denied in part and granted in part.

### I. Background

#### A. Factual Background

For the purposes of this Motion, the Court treats the allegations in the FAC as true. Plaintiffs own property located in the Town of Goshen, New York. (FAC ¶ 7.) Plaintiffs entered into three contracts with Defendant, Centex Homes, LLC ("Defendant" or "Centex"), pursuant to which Centex would buy and develop three separate parcels of land. (*Id.* ¶¶ 7–10.) Centex moves to dismiss Count Three of the

FAC only. (Mem. in Supp. of Centex Homes, LLC's Mot. to Dismiss Pursuant to R. 12(b)(6) ("Def.'s Mem.") 1.) Count Three of the FAC deals with only one of the three contracts at issue in this case, and so the Court will outline only the facts related to that contract. (FAC ¶¶ 78–91.)

Plaintiffs' parcel of land at issue is "described as Section 15, Block 1, and Lot 33 on the Town of Goshen Tax Map" ("Parcel 3"). (*Id.* ¶ 10.) In an agreement dated May 9, 2005 (the "Parcel 3 Agreement"), the Parties agreed that Centex would purchase and develop Parcel 3 subject to various terms and conditions. (*Id.* ¶¶ 10, 79; *id.* Ex. C, at 12.) Specifically, the Parcel 3 Agreement provided for four separate deposits, collectively referred to as the "Deposit," which together total $350,000. (*Id.* Ex. C ¶ 1(b)(i)-(vi).) The schedule of when these deposits were due is not relevant for this Motion. Centex was given sixty days from the date of the contract to "make such zoning, legal, title ..., engineering, environmental, soil, geological, financial and technical studies, and such other tests, investigations and inquiries (hereinafter 'Feasibility Studies') as it shall deem necessary and appropriate" (the "Feasibility Period"). (*Id.* Ex. C ¶ 7(a).) Centex was required to provide Plaintiffs with a copy of "any Feasibility Studies generated by [Centex]" within 5 days of receipt. (*Id.*) If Centex "determine[d], in the sole exercise of its discretion, that it [could not] proceed with the acquisition of [Parcel 3] based upon the Feasibility Studies, [Centex] ... ha[d] the right, at its option, upon written notice to [Plaintiffs] ... delivered on or before the last day of the Feasibility Period, time being of the essence, to cancel th[e] [Parcel 3] Agreement and recover the Deposit." (*Id.* Ex. C ¶ 7(b).) However, if Centex "breach[ed] th[e] [Parcel 3] Agreement or otherwise defaul[ted] in the perform-

ance of th[e] [Parcel 3] Agreement, then [Plaintiffs] . . . ha[d] the right to terminate the [Parcel 3] Agreement and [were] entitled to retain all Deposit Monies as liquidated damages." (*Id.* Ex. C ¶ 13.) The prevailing party in any litigation that was "related to our [sic] arising out of" the Parcel 3 Agreement is also entitled to legal fees. (*Id.* Ex. C. ¶ 18(*o* ).)

The Parcel 3 Agreement provided that it was the "sole and entire [a]greement" between the Parties (as to Parcel 3), could not be modified orally, "but only by a written agreement executed by the [P]arties," and "sh[ould] be construed without regard to any presumption or other rule requiring construction against the party causing the [Parcel 3] Agreement to be drafted," because "each [P]arty and its counsel [ ] participated in the negotiation and preparation of th[e] [Parcel 3] Agreement." (*Id.* Ex. C ¶ 18(b), (f), (i).)

As noted, the Parcel 3 Agreement provided for a "Feasibility Period," at the end of which Centex was entitled to terminate the Agreement. (*Id.* ¶¶ 82–83.) This Centex did in July 2005. (*Id.* ¶ 84.) However, Plaintiffs allege that Centex did not perform any Feasability Studies within the Feasability Period, and that Centex's contractual right of termination was premised on reasons arising out of such Feasability Studies. (*Id.* ¶¶ 84–85.) Plaintiffs also allege that Centex terminated the Parcel 3 Agreement in bad faith.. (*Id.* ¶ 89.) However, the vast majority of the FAC details allegations that relate only to the other contracts and allegations of bad faith dealings under them. (*See generally id.* ¶¶ 11–77.) Plaintiffs seek damages under the Parcel 3 Agreement in the form of deposits and legal fees. (*Id.* ¶ 91.)

*B. Procedural Background*

Plaintiffs first brought this diversity action on June 19, 2008. (Dkt. No. 1.) The FAC was filed on August 20, 2008. (Dkt. No. 9.) The Complaint and FAC were both compiled by counsel for Plaintiffs. (Dkt. Nos. 1, 9, 12.) Defendant answered the FAC on September 8, 2008, and asserted counterclaims against Plaintiffs. (Dkt. No. 11.) Plaintiffs' counsel was granted leave to withdraw on November 20, 2008. (Order (Dkt. No. 19).) Prospective counsel for Plaintiffs contacted the Court to request an extension of Plaintiffs' time to answer Centex's counterclaims, which was granted on December 2, 2008. (Dkt. No. 23.) Plaintiffs answered on December 23, 2008. (Dkt. No. 24.) On the same date, the Court received a letter from prospective counsel for Plaintiffs stating that though they had drafted Plaintiffs' Answer, they would not be appearing on behalf of Plaintiffs. (Dkt. No. 25.)

The letter also informed the Court that one of the Plaintiffs had died in early December. (*Id.*) The Court later learned that Bosiljka Serdarevic had died, and that Dr. Olivia Serdarevic would act on behalf of her estate, as well as on her own behalf. As no Party objected, the Court substituted the Estate of Bosiljka Serdarevic for Bosiljka Serdarevic as Plaintiff on September 29, 2010. (Dkt. No. 59.) At a conference on July 13, 2009, Plaintiffs indicated that the case should be officially designated *pro se.* Defendant filed amended counterclaims on July 24, 2009. (Centex Homes, LLC's Answer to First Am. Compl. & Am. Countercl.) In the interim, Plaintiffs were attempting to retrieve their case file from their original lawyers, who had entered bankruptcy. (*See, e.g.,* Dkt. No. 29.) The Parties continued to progress towards resolution of some issues, and Plaintiffs continued to seek counsel and the case file until late November 2009. (*See, e.g.,* Dkt. Nos. 36, 40.) Defendant's Motion to Dismiss was filed on January 11,

2010, and fully submitted on March 5, 2010. (Dkt. Nos. 46, 50.)

## II. Discussion

### A. Standard of Review

■ As Defendant filed its Motion to Dismiss after answering, the Court treats the Motion as if made pursuant to Federal Rule of Civil Procedure 12(c). *See Zinter Handling, Inc. v. Gen. Electric Co.*, No. 04–CV–500, 2005 WL 1843282, at *1 n. 2 (N.D.N.Y. Aug. 2, 2005). In a Rule 12(c) motion, the Court " 'appl[ies] the same standard as that applicable to a motion under Rule 12(b)(6), accepting the allegations contained in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party,' unless the allegations are 'supported by mere conclusory statements.' " *Hayden v. Paterson*, 594 F.3d 150, 157 n. 4 (2d Cir.2010) (quoting *Burnette v. Carothers*, 192 F.3d 52, 56 (2d Cir.1999), and *Ashcroft v. Iqbal*, ——— U.S. ———, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009), respectively).

■ "On a Rule 12(b)(6) motion to dismiss a complaint, the court must accept a plaintiff's factual allegations as true and draw all reasonable inferences in [the plaintiff's] favor." *Gonzalez v. Caballero*, 572 F.Supp.2d 463, 466 (S.D.N.Y.2008); *see also Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir.2008) ("We review *de novo* a district court's dismissal of a complaint pursuant to Rule 12(b)(6), accepting all factual allegations in the complaint and drawing all reasonable inferences in the plaintiff's favor." (internal quotation marks omitted)). When considering a motion to dismiss a pro se complaint, the court must interpret the complaint liberally to raise the strongest arguments that the allegations suggest. *See Cruz v. Gomez*, 202 F.3d 593, 597 (2d Cir.2000); *see also Hughes v. Rowe*, 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (noting that courts should hold pro se pleadings "to

less stringent standards than formal pleadings drafted by lawyers" (internal quotation marks omitted)). The FAC was prepared by Plaintiffs' original counsel. Therefore, it is at least arguable that the FAC does not deserve any more liberal a reading than would a standard complaint. *See Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474–75 (2d Cir.2006) (per curiam) (explaining that pro se "*submissions*" should be read more liberally than attorney drafted submissions because "implicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances . . . because of [a pro se litigant's] lack of legal training" (emphasis added) (internal quotation marks and brackets omitted)). However, the result in this case would be the same regardless of how liberally the FAC is construed.

■ "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment]' to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (alteration in original) (internal citations omitted). Instead, the Supreme Court has emphasized that "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.*, and that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, 127 S.Ct. 1955. A plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570, 127 S.Ct. 1955. If a plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Id.; see also*

*Iqbal,* 129 S.Ct. at 1950 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (alteration in original) (internal citation omitted) (quoting Fed.R.Civ.P. 8(a)(2))).

■■■ Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.,* 199 F.3d 99, 107 (2d Cir.1999) (internal quotation marks omitted). "The court may ... consider matters of which judicial notice may be taken, even if the corresponding documents are not attached to or incorporated by reference in the complaint." *Munno v. Town of Orangetown,* 391 F.Supp.2d 263, 268 (S.D.N.Y.2005); *see also Kramer v. Time Warner Inc.,* 937 F.2d 767, 774 (2d Cir.1991) (holding that district court properly took judicial notice on a motion to dismiss of public documents filed with the SEC). In the motion to dismiss context, however, a court should generally take judicial notice "to determine what statements [the documents] contain[ ] ... not for the truth of the matters asserted." *Kramer,* 937 F.2d at 774.

### B. Contract Interpretation

#### 1. General Principles.

■■■ Neither Party disputes that this case is subject to New York's substantive law of contracts. (FAC Ex. C ¶ 18(c) ("Th[e] [Parcel 3] Agreement shall be gov-

erned by and construed in accordance with the laws of the State of New York.").) In New York, "a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed." *Terwilliger v. Terwilliger,* 206 F.3d 240, 245 (2d Cir.2000) (citing *Breed v. Ins. Co. of N. Am.,* 46 N.Y.2d 351, 413 N.Y.S.2d 352, 385 N.E.2d 1280, 1282 (1978)).

■■■ "Under New York law, the initial interpretation of a contract is a matter of law for the court to decide. Where the agreement is unambiguous, a court may not admit extrinsic evidence and interprets the plain language of the agreement as a matter of law." *Kamfar v. New World Rest. Grp., Inc.,* 347 F.Supp.2d 38, 48–49 (S.D.N.Y.2004) (internal footnote omitted); *see also RJE Corp. v. Northville Indus. Corp.,* 329 F.3d 310, 314 (2d Cir.2003) ("Where a 'contract is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence.'" (quoting *De Luca v. De Luca,* 300 A.D.2d 342, 751 N.Y.S.2d 766, 766 (2002))); *Terwilliger,* 206 F.3d at 245 ("[M]atters extrinsic to the agreement may not be considered when the intent of the parties can fairly be gleaned from the face of the +instrument." (citing *Teitelbaum Holdings, Ltd. v. Gold,* 48 N.Y.2d 51, 421 N.Y.S.2d 556, 396 N.E.2d 1029, 1032 (1979))).

■■■ On a motion to dismiss, the Court may resolve issues of contract interpretation when the contract is properly before the Court, but must resolve all ambiguities in the contract in Plaintiffs' favor. *See Banks v. Corr. Servs. Corp.,* 475 F.Supp.2d 189, 195 (E.D.N.Y.2007) ("If the interpretation of a contract is at issue, a court is 'not constrained to accept the alle-

gations of the complaint in respect of the construction of the [a]greement,' although all contractual ambiguities must be resolved in the plaintiffs favor." (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995))); *see also Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153–54 (2d Cir.2002) (noting that a district court may interpret a contract properly before it on a motion to dismiss, but vacating the district court's dismissal because it also considered extraneous material not properly before it at the Rule 12(b)(6) stage and did not properly convert the motion to a Rule 56 motion for summary judgment). However, the mere fact that the Parties disagree on the proper interpretation of the contract does not render the contractual language ambiguous. *See Metro. Life Ins. Co. v. RJR Nabisco, Inc.,* 906 F.2d 884, 889 (2d Cir. 1990) ("Language whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation."); *O.D.F. Optronics Ltd. v. Remington Arms Co.,* No. 08–CV–4746, 2008 WL 4410130, at *11 (S.D.N.Y. Sept. 26, 2008) ("The language of a contract is not made ambiguous simply because the parties urge different interpretations.'" (quoting *Seiden Assocs., Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992))). "Contract language is not ambiguous if it has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Hunt Ltd. v. Lifschultz Fast Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir. 1989) (alteration in original) (quoting *Breed,* 413 N.Y.S.2d 352, 385 N.E.2d at 1282).

### 2. Documents the Court may Consider

The Court may consider the Parcel 3 Agreement because it is attached to the FAC. (FAC Ex. C); *see Leonard F.,* 199 F.3d at 107 (noting that courts may consider material appended to the complaint on a motion to dismiss). For the same reason, the Court may consider any other material attached to the FAC. Centex, however, urges the Court to consider documents not attached to the FAC. (Def.'s Mem. 6–7 & n. 1.)

The first document Centex asks the Court to consider is a letter dated June 17, 2005, from Centex's Senior Vice President, Robert A. Fourniadis, to Mr. Leonard Budow, Esq. (Plaintiffs' representative) in which Centex informed Plaintiffs that, according to Centex's planner, "it is unlikely any number of lots could be built" on Parcel 3, and that Centex would "probably be exercising [its] option to terminate th[e] [Parcel 3] Agreement at the end of the due diligence period." (*Id.* Ex. 2.) The second document is a letter dated July 15, 2005, from Mr. Fourniadis to Mr. Budow and Dr. Serdarevic informing Plaintiffs that Centex had "completed [its] feasibility studies" and "must terminate the [Parcel 3 Agreement] as a result of [the] studies" (the "Termination Letter"). (*Id.* Ex. 3.) The third document is a letter dated July 15, 2005, from Mr. Budow to Mr. Fourniadis, in which Mr. Budow, on behalf of Plaintiffs, "acknowledge[d] receipt of cancellation on Parcel 3," and credited the deposit monies paid on Parcel 3 to the other properties Plaintiffs were selling to Centex. (*Id.* Ex. 4.) The fourth document is another letter from Mr. Budow to Mr. Fourniadis, also dated July 15, 2005, reserving Plaintiffs' rights under the Parcel 3 Agreement until Centex complied with paragraph 7(b) of the Parcel 3 Agreement, which requires written notice delivered within the Feasibility Period. (*Id.* Ex. 5.) The fifth document is a letter from Mr. Budow to Mr. Fourniadis dated August 21, 2005, stating that the cancellation of the

Parcel 3 Agreement was ineffective because it was not timely and because it was not based on Feasibility Studies, and demanding payment of the Deposit. (*Id.* Ex. 5.)[1] The final document is a letter from Mr. Fourniadis to Mr. Budow dated August 23, 2005, denying both that the notice of cancellation was untimely, and that it was not in accord with Centex's contractual rights. (*Id.* Ex. 6.)

■■■ Centex argues that these documents are integral to the FAC (*id.* at 7 n. 1), and relies on *Druyan v. Jagger*, 508 F.Supp.2d 228 (S.D.N.Y.2007). In *Druyan*, the court considered three documents to be "integral" to the complaint despite not being incorporated therein. *Id.* at 236. Two of those documents were ones that the plaintiff alleged she relied on to her detriment. *Id.* ("[Plaintiff] cannot make allegations about her reliance [on a certain document] but postpone consideration of the merits of her claims by failing to attach them to, or incorporate them by reference in, the complaint."). The third document was the ticket plaintiff was suing in consequence of, and which the court stated "without which [the] plaintiff would have no claim to assert." *Id.* The only document that Centex asks the Court to consider that is similar to the documents in *Druyan* is the Termination Letter, because that is the document in which Centex states that it is exercising its right to terminate the Parcel 3 Agreement which, like the ticket in *Druyan*, is the event that gives rise to Plaintiffs' claims. This is in accord with the more general rule that a court may consider documents *relied on* by a plaintiff where the document is integral to the complaint. *See, e.g., Svensson v. Securian Life Ins. Co.*, 706 F.Supp.2d 521, 525 (S.D.N.Y.2010) (considering an insurance policy when the complaint "explicitly

refer[ed] to, and relie[d] on the [p]olicy"); *McKevitt v. Mueller*, 689 F.Supp.2d 661, 665 (S.D.N.Y.2010) (noting that a court may consider "documents that the plaintiff *relied on in bringing suit* and that are either in plaintiff's possession or that the plaintiff knew of when bringing suit" (emphasis added)). The FAC alleges that "[i]n July 2005, Centex purported to exercise its right to terminate the Parcel 3 Agreement." (FAC ¶ 84.) Therefore, the FAC relies on the Termination Letter, and the Court shall consider it. There are no similar references to the other documents Centex asks the Court to consider, and no other evidence that Plaintiffs relied on those documents. Certainly Centex presents no evidence, or even argument, suggesting that Plaintiffs relied on the other documents it wishes the Court to consider. Furthermore, the remaining documents do not appear to be integral to the FAC— they are background to the events leading to this lawsuit. Therefore, the Court shall not consider them in deciding this Motion.

■■■ Plaintiffs, by attaching numerous exhibits to their motion papers, also seek consideration of documents outside the FAC. However, Plaintiffs may no more amend the FAC through motion papers, than Defendants may supplement the record with documents not integral to the FAC. *See Yarborough v. Queens Auto Mall, Inc.*, No. 08–CV–3179, 2010 WL 1223584, at *2 (E.D.N.Y. Mar. 23, 2010) ("Plaintiff[s] may not amend [their] complaint through [their] motion papers." (citing *Wright v. Ernst & Young, LLP*, 152 F.3d 169, 178 (2d Cir.1998))). Therefore, the Court will not consider these exhibits.

### 3. Count 3: Breach of the Parcel 3 Agreement

■■■ Under New York law, "the essential elements of a cause of action to recover

---

1. Defendant's Memorandum contains two Exhibit 5's. This document is the second Exhibit 5. Correspondingly, the previous citation was to the first Exhibit 5.

damages for breach of contract, [are]: the existence of a contract, the plaintiff's performance under the contract, the defendant's breach of that contract, and resulting damages." *JP Morgan Chase v. J.H. Electric of N.Y., Inc.,* 69 A.D.3d 802, 893 N.Y.S.2d 237, 239 (2010); *see also Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank,* 392 F.3d 520, 525 (2d Cir.2004) ("[A] *prima facie* case for breach of contract . . . [is established by]: (1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach." (emphasis in original)). Defendant focuses solely on the issue of breach. (Def.'s Mem. 5–9.)

 Plaintiffs allege breach by virtue of Centex's termination despite Centex's alleged failure to perform Feasibility Studies. (FAC ¶¶ 84–85, 89.)[2] The Termination Letter begins with the statement "[w]e have completed our feasibility studies." (Def.'s Mem. Ex. 3.) This, however, does not defeat Plaintiffs' claim. First, Plaintiffs allege that the Feasibility Studies, if completed, were not timely. (FAC ¶ 85.) Second, it is plausible to infer from the FAC that Plaintiffs believe either that Centex's statement is simply untrue, or that what Centex characterizes as a Feasibility Study is not a Feasibility Study. *See Twombly,* 550 U.S. at 570, 127 S.Ct. 1955 (requiring a plaintiff to allege "enough facts to state a claim to relief that is plausible on its face"). Third, the statement is ambiguous, as the statement would still be true if Centex had decided not to conduct Feasibility Studies, and was attempting to convey that Centex considered the Feasibility Period concluded. The question before the Court, therefore, is whether the contract required Centex to perform a Feasibility Study before exercising its right to terminate the Parcel 3 Agreement.

The Parcel 3 Agreement provides that:

[i]n the event that [Centex] determines, in the sole exercise of its discretion, that it cannot proceed with the acquisition of the Property based upon the Feasibility Studies, [Centex] shall have the right, at its option, upon written notice to [Plaintiffs] . . . delivered on or before the last day of the Feasibility Period, time being of the essence, to cancel this Agreement and recover the Deposit, following which there shall be no further liability or obligation on either of the parties hereto and th[e] [Parcel 3] Agreement shall become NULL AND VOID.

(FAC Ex. C ¶ 7(b) (emphasis in original).) Centex focuses on the phrase "sole exercise of its discretion," and argues that "Plaintiffs gave Centex an absolute right to terminate, for any reason Centex chose." (Def.'s Mem. 5–8.) Plaintiffs focus on the phrase "based upon the Feasibility Studies," and argue that Centex could only terminate the Parcel 3 Agreement for reasons arising from the Feasibility Studies. (Pls.' Mem. at unnumbered eleventh page.) For the reasons given below, Plaintiffs have the better of this argument.

 Centex's argument is premised on the fact that the Parcel 3 Agreement allowed Centex to perform any Feasibility Studies "as it shall deem necessary and appropriate." (FAC Ex. C ¶ 7(a).) From this, Centex concludes that it was permit-

---

**2.** Plaintiffs also appear to argue that Centex breached the agreement by failing to use its best efforts to garner the necessary permits and other local approvals for the proposed development. (Mem. of Law in Opp'n to Def.'s Mot. to Dismiss Pursuant to Rule 12(b)(6) ("Pls.' Mem.") at unnumbered eleventh page.) However, there are no factual allegations in the FAC to support such a claim vis a vis the Parcel 3 Contract. To the extent that Plaintiffs wish to include such a claim, Plaintiffs must amend the FAC.

ted to perform no studies whatsoever, and, hence, could not be required to perform a Feasibility Study in order to exercise its termination rights. (Def.'s Mem. 7–8.) The Court agrees that Centex might have had the right not to perform Feasibility Studies if it so chose.[3] However, it is also consistent with the language of the Parcel Agreement to determine that one of the consequences of not performing a Feasibility Study was that Centex gave up its right to terminate "based upon the Feasibility Studies." In other words, it is consistent with the language of the Parcel 3 Agreement to conclude that while nonperformance of Feasibility Studies would not itself breach the Parcel 3 Agreement, nonperformance followed by termination under the Feasibility Period provisions would.

■ As caselaw requires, this interpretation avoids rendering any contractual language redundant. *See Verzani v. Costco Wholesale Corp.*, 641 F.Supp.2d 291, 299 (S.D.N.Y.2009) ("[T]he [C]ourt may not read the agreement to make any of its terms meaningless, or construe its language to render particular provisions mere surplusage." (internal quotation marks omitted)), *aff'd*, 387 Fed.Appx. 50 (2d Cir.

---

**3.** The Parcel 3 Agreement provides that: "[Centex] shall have a period of sixty (60) days ... to make such zoning, legal, title ..., engineering, environmental, soil, geological, financial and technical studies, and such other tests, investigations and inquiries (hereinafter 'Feasibility Studies') as it shall deem necessary and appropriate." (FAC Ex. C ¶ 7(a).) Plaintiffs argue that "[t]aking the plain meaning of the word 'such' ..., the [Parcel 3 Agreement] clearly indicate[s] that Centex was required to perform at least one type of [each enumerated category of Feasibility Study]. The conjunction[] 'and'[] before 'technical studies' at the end of that clause reinforces the meaning that all of those studies were required." (Pls.' Mem. at unnumbered third-fourth pages (emphasis omitted).) This argument is unavailing. First, as Plaintiffs acknowledge, "such" simply means "of that kind, character, degree, extent, etc." (*Id.* at unnumbered third page (internal quotation marks omitted).) "Such" does not imply individual enumeration—it may apply generally. This interpretation is reinforced by the recitation of different kinds of studies after "such." Second, the conjunction before "technical studies" merely signifies the end of the list of enumerated categories of Feasibility Studies. Plaintiffs may be correct that, as a matter of grammatical construction, the phrase "as it shall deem necessary and appropriate" applies only to "such other tests, investigations and inquiries." The comma after "studies" and before "and" serves to separate out the two clauses and, hence, could be interpreted to limit the scope of the phrase "as it shall deem necessary and appropriate." *See* William Strunk Jr. & E.B. White, The Elements of Style 5 (4th ed.2000) (explaining that a comma should be placed before a conjunction introducing an independent clause). However, "[t]he Court is mindful of the Supreme Court's admonition that 'a purported plain-meaning analysis based only on punctuation is necessarily incomplete and runs the risk of distorting a statute's true meaning,'" and that "the same logic would apply to contract interpretation." *World Props., Inc. v. Arlon, Inc.*, 663 F.Supp.2d 98, 107 (D.Conn. 2009) (quoting *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 454, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993)) (internal quotation marks omitted). In this case, the same logic that would apply "as it shall deem necessary and appropriate" to only "such other tests, investigations and inquiries" would also require that only "such other tests, investigations and inquiries" were being referred to by "(hereinafter 'Feasibility Studies')." This interpretation is not only a strange and awkward result, it is also contrary to the manner in which Plaintiffs use the words "feasibility studies" (Pls.' Mem. at unnumbered fourth page), and does not make sense in light of the Parcel 3 Agreement's description of, for example, "soil analysis" as a "Feasibility Stud[y]," (FAC Ex. C ¶ 7(c)). However, even if Plaintiffs' grammatical analysis were both correct and controlling, it would not support a conclusion that Centex was required to perform each and every type of Feasibility Study enumerated. Put simply, there is no language in the Parcel 3 Agreement supporting such a conclusion.

2010); *Del Global Techs. Corp. v. Park,* No. 03–CV–8867, 2008 WL 5329963, at *4 (S.D.N.Y. Dec. 15, 2008) (describing treating contractual language "as meaningless surplusage" as "violating the cardinal rule of contract interpretation" (internal quotation marks omitted)). To adopt Centex's interpretation that Centex had an absolute right to terminate the Parcel 3 Agreement for any reason would make the phrase "based upon the Feasibility Studies" meaningless. The phrase "in the sole exercise of [Centex's] discretion" is not rendered meaningless by the interpretation urged by Plaintiffs, because it guarantees to Centex that their interpretation or analysis of the Feasibility Studies could not be countermanded by Plaintiffs. However, the Court need not decide this issue as a matter of law. At the very least, these arguments demonstrate that Plaintiffs' interpretation, even if not required, is a plausible interpretation of an ambiguous phrase. On a motion to dismiss, all ambiguities must be resolved in Plaintiffs' favor. *See Banks,* 475 F.Supp.2d at 195. Therefore, Centex's Motion to Dismiss the breach of contract theory supporting Count Three is denied.

### 4. *Good Faith and Fair Dealing*

New York also imposes an implied duty of good faith and fair dealing, such that a party may be in breach of the duty even where it has abided by the strict terms of the contract. *See Forman v. Guardian Life Ins. Co. of Am.,* 76 A.D.3d 886, 888–89, 908 N.Y.S.2d 27 (2010) (upholding a good faith and fair dealing claim against a motion to dismiss where the defendant allegedly "frustrated the basic purpose of the parties' contracts" without an allegation that the defendant breached the contract); *Duration Mun. Fund, L.P. v. J.P. Morgan Sec. Inc.,* 25 Misc.3d 1203(A), 2009 WL 2999201 at *6 (N.Y.Sup. Ct.2009) ("[A] party may be in breach of an implied duty of good faith and fair dealing, even if it is not in breach of its express contractual obligations, when it exercises a contractual right as part of a scheme to ... deprive the other party of the fruit of its bargain."); *Gray & Assocs., LLC v. Speltz & Weis LLC,* 22 Misc.3d 1124(A), 2009 WL 416138 at *9 (N.Y.Sup. Ct.2009) ("A party may be in breach of the implied duty of good faith and fair dealing, which is implicit in every contractual arrangement, when it exercises a contractual right as part of a scheme to ... deprive the other party of the fruit of its bargain."). These cases capture the view of the New York First Appellate Department:

> We recognize that there is clearly some tension between, on the one hand, the imposition of a good faith limitation on the exercise of a contract right and, on the other, the avoidance of using the implied covenant of good faith to create new duties that negate explicit rights under a contract. However, the allegations here clearly go beyond claiming only that [the defendant] should be precluded from exercising a contractual right; they support a claim that [the defendant] exercised a right malevolently, for its own gain as part of a purposeful scheme designed to deprive plaintiffs of the benefits of the joint venture and of the value of their preexisting holdings in [a third party]. These allegations do not create new duties that negate [the defendant's] explicit rights under a contract, but rather, seek imposition of an entirely proper duty to eschew this type of bad-faith targeted malevolence in the guise of business dealings.

*Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.,* 309 A.D.2d 288, 765 N.Y.S.2d 575, 587 (2003). Therefore, to assert a cause of action for the breach of good faith

and fair dealing that is not duplicative of Plaintiffs' breach of contract claim, *see Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 80 (2d Cir.2002) ("A claim for breach of the implied covenant [of good faith and fair dealing] will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract." (internal quotation marks omitted)); *Amcan Holdings, Inc. v. Canadian Imperial Bank of Commerce*, 70 A.D.3d 423, 894 N.Y.S.2d 47, 49–50 (2010) (noting that a claim of breach of the covenant of good faith and fair dealing should be "dismissed as duplicative of the breach-of-contract claim, [when] both claims arise from the same facts and seek the identical damages for each alleged breach" (internal citation omitted)), Plaintiffs must allege that Centex *did* perform Feasibility Studies, and terminated the Parcel 3 Agreement using the Feasibility Studies as a reason—i.e. Centex fulfilled its contractual obligations—but that its invocation of the Feasibility Studies was done in bad faith in order to deprive Plaintiffs of the benefit of their bargain.[4]

First, Plaintiffs have not alleged this, and, instead, have merged their breach of contract and good faith and fair dealing claims by alleging that Defendant failed to perform any Feasibility Studies. (FAC ¶ 89 ("By purportedly terminating the Parcel 3 Agreement without performing any [F]easibility [S]tudies, Centex has also breached the implied covenant of good faith and fair dealing.").) Second, even assuming that Plaintiffs had alleged such a theory, it arguably is barred by New York

law. In *Moran v. Erk*, 11 N.Y.3d 452, 872 N.Y.S.2d 696, 901 N.E.2d 187 (2008), the New York Court of Appeals held that no cause of action for breach of the covenant of good faith and fair dealing could be premised on an attorney approval provision that did not explicitly limit the attorney's discretion. *Id.*, 872 N.Y.S.2d 696, 901 N.E.2d at 192 (noting that the contract must provide for "further limitations" before a cause of action for breach of the covenant of good faith and fair dealing can be maintained). Subsequent cases have interpreted *Moran* broadly. *See World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*, No. 03–CV–8843, 2010 WL 3155176, at *13–14 (S.D.N.Y. July 30, 2010) (noting that "other courts have extended *Moran's* logic to other types of discretionary clauses," and applying *Moran's* logic accordingly); *Stokes v. Lusker*, No. 08–CV–3667, 2009 WL 612336, at *8 (S.D.N.Y. Mar. 4, 2009) ("[A] discretionary contingency clause does not carry with it an implied duty of good faith, unless it was explicitly part of the bargain."); *Paxi, LLC v. Shiseido Ams. Corp.*, 636 F.Supp.2d 275, 286 (S.D.N.Y.2009) ("[T]he obligation of good faith and fair dealing does not negate an expressly bargained-for clause that allows a party to exercise its discretion, unless that clause imposes a limit on the discretion to be exercised or explicitly states that the duty of good faith and fair dealing applies."). In this case, the Parcel 3 Agreement explicitly limits the discretion delegated to Centex by saying that the exercise of Centex's discretion must be "based upon the Feasibility Studies" (FAC Ex. C ¶ 7(b)), but Centex's discretion is not limited further by the Parcel

---

4. Though Plaintiffs could argue that Centex maliciously failed to perform Feasibility Studies in order to deprive Plaintiffs of the benefit of their bargain, it is not the failure to perform Feasibility Studies that harmed Plaintiffs, but the alleged termination without

reference to Feasibility Studies. Rather, the alleged act of not performing any Feasibility Studies is identical to the breach of contract claim and, hence, is duplicative. *See Harris*, 310 F.3d at 80.

3 Agreement. Thus, while Plaintiffs may pursue a breach of contract claim against Centex based on the theory that Centex did not base its determination upon any Feasibility Studies, there remains a serious question whether they can pursue a breach of the implied covenant of good faith based on the theory that Centex *did* base its determination on a Feasibility Study, but did so in bad faith. *Moran*, as broadly applied by some courts, suggests that such an action is not viable because such a theory would impose limitations on Centex's discretion that are not created by the language of the Parcel 3 Agreement. In any event, because Plaintiffs have not adequately pled facts which support a claim of breach of the covenant of good faith and fair dealing, as distinguished from a breach of contract, Centex's Motion to Dismiss the good faith and fair dealing theory supporting Count Three is granted without prejudice.

### III. Conclusion

For the reasons given herein, Defendant's Motion to Dismiss is denied in part and granted in part without prejudice. Plaintiffs have thirty days to file a Second Amended Complaint, consistent with this Opinion. The Clerk of the Court is respectfully requested to terminate the relevant motion (Dkt. No. 46).

SO ORDERED.