NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 17-1958
_____

In re:  ENERGY FUTURE HOLDINGS CORP. a/k/a TXU Corp. a/k./a TXU Corp a/k/a
TEXAS Utilities, et al.,

Debtors

MARATHON ASSET MANAGEMENT LP;
POLYGON CONVERTIBLE OPPORTUNITY MASTER FUND;
POLYGON DISTRESSED OPPORTUNITIES MASTER FUND,
Appellants

v.

WILMINGTON TRUST N.A. as First Lien Collateral Agent
and First Lien Administrative Agent;
ANGELO GORDON & CO. L.P.; APOLLO ADVISORS VII, L.P.;
BROOKFIELD ASSET MANAGEMENT PRIVATE INSTITUTIONAL CAPITAL
ADVISOR (CANADA) L.P.;
JOHN DOE #1 THROUGH JOHN DOE #10

_____

Appeal from the United States District Court
for the District of Delaware
(D.C. Civil Action No. 1-16-cv-00287)
District Judge: Honorable Richard G. Andrews

_____

Argued November 15, 2017

Before: AMBRO, KRAUSE, and RENDELL, Circuit Judges

(Opinion filed: August 7, 2018)

Philip D. Anker, Esquire
George W. Shuster, Jr., Esquire    (Argued)
WilmerHale
7 World Trade Center
250 Greenwich Street
New York, NY  10007


Benjamin W. Loveland, Esquire
Wilmer Cutler Pickering Hale and Dorr
60 State Street
Boston, MA   02109

Adam G. Landis, Esquire
Matthew B. McGuire, Esquire
Landis Rath & Cobb
919 Market Street
Suite 1800, P.O. Box 2087
Wilmington, DE  19899

        Counsel for Appellants

Michael D. DeBaecke, Esquire
Blank Rome
1201 Market Street, Suite 800
Wilmington, DE  19801

Mark D. Kotwick, Esquire
Seward & Kissel
One Battery Park Plaza
New York, NY   10004

Bradley R. Aronstam, Esquire
Nicholas D. Mozal, Esquire
Benjamin J. Schladweiler, Esquire
Ross Aronstam & Moritz
100 South West Street, Suite 400
Wilmington, DE  19801

George A. Davis, Esquire
Jonathan Rosenberg, Esquire
Daniel S. Shamah, Esquire

Andrew Sorkin, Esquire
O'Melveny & Myers
7 Times Square
Times Square Tower, 33rd Floor
New York, NY   10036

Peter M. Friedman, Esquire          (Argued)
O'Melveny & Myers
1625 I Street, N.W.
Washington, DC  20006

        Counsel for Appellees

Neil B. Glassman, Esquire
GianClaudio Finizio, Esquire
Bayard, P.A.
600 North King Street, Suite 400
Wilmington, DE  19801

Michael S. Kim, Esquire
Jeremey C. Hollembeak, Esquire
Kobre & Kim LLP
800 Third Avenue
New York, NY   10022

        Counsel for Amicus Curiae
        In Support of Appellants

───────────────

OPINION[*]

───────────────

AMBRO, <u>Circuit</u> <u>Judge</u>

        Texas Competitive Electric Holdings Company LLC ("TCEH") filed for Chapter

11 bankruptcy relief in the United States Bankruptcy Court for the District of Delaware.

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

Lenders of $24.5 billion to TCEH were among its creditors. In an inter-creditor dispute, entities now in the shoes of those who funded a letter of credit facility (collectively, "Appellants") seek payment of certain funds before the other lenders (the "Other Lenders"). They appeal the dismissal by the Bankruptcy Court, affirmed by the District Court, of their Complaint. We also affirm. In doing so, we deal with many definitions in a complex set of documents. Thus this not-precedential opinion (it makes no new law nor clarifies existing precedent) is longer than normal.

## I. Background

### A. The Loans

In 2007 a private equity group bought for $45 billion TXU Corporation, which later became Energy Future Holdings Corp., the principal debtor in the Chapter 11 bankruptcy cases in the District of Delaware. The transaction—called a leveraged buyout because the purchased assets secured (that is, leveraged) the loans made for the purchase—involved in part TCEH, a TXU subsidiary, borrowing $24.5 billion in the aggregate per three credit facilities—a term loan, a revolving line of credit arrangement, and a deposit letter of credit facility (the last, hereinafter capitalized as a defined term, is the subject of this appeal). The loans involved nine different lenders (collectively, with their successors and assigns, the "Lenders"), including entities associated with Citibank, JP Morgan Chase, Goldman Sachs, Lehman Brothers, and Morgan Stanley. Though the credit facilities had but one Credit Agreement, different (though overlapping) subgroups of the Lenders funded each of them. Hence the Lenders, among others, entered into an intercreditor agreement (hereinafter also capitalized as a defined term). To repeat,

4

Appellants are successors to the entities whose $1.25 billion aggregate loan funded the Deposit Letter of Credit Facility (those entities are referred to as "Deposit L/C Lenders").

## B. The Deposit Letter of Credit Facility

A letter of credit reduces the risk of payment default. Suppose an entity purchased gas to be extracted from the Gulf Basin a year later, promising the seller payment on delivery. To back up its promise, the purchaser could ask a bank to agree with the seller that, among other things, it will cover amounts in default if the company fails to pay what it owes. That back-up support, a letter of credit, would shift the risk of nonpayment from the purchaser to the bank, which typically is in a better position to know the former's creditworthiness. The bank would, after a payment on its letter of credit, seek reimbursement from the purchaser.

As already noted, this appeal involves the Deposit Letter of Credit Facility. A "deposit" letter of credit is backed by a cash deposit used to reimburse the letter of credit bank (a "Deposit Letter of Credit Issuer" or "Issuer"; as noted below, here it is Citibank). In this way, the risk of nonpayment shifts from the Issuer back to the debtor—TCEH in our case. After the Deposit L/C Lenders furnished the $1.25 billion for the Deposit Letter of Credit Facility, those funds were deposited into a segregated account called the Deposit L/C Loan Collateral Account (sometimes referred to simply as the "Account"). Essentially, the facility consisted of Citibank's agreement to issue deposit letters of credit for TCEH (the "Deposit Letters of Credit" or "Deposit L/Cs") plus Citibank's right to have drawings reimbursed from this account. (Although the loan transactions allowed for the addition of multiple Deposit Letter of Credit Issuers, we understand no party other

5

than Citibank signed on.)  There was always enough on balance to cover the full amount of the Deposit Letters of Credit that had been or could be issued.  Moreover, Citibank was appointed the custodian of the account (in this capacity, the "Collateral Agent"), so it was able to release the reimbursement funds to itself for Deposit L/Cs.

Appellants seek to be paid from the remaining money in the Deposit L/C Loan Collateral Account before the Other Lenders who participated in loaning the remaining $23.25 billion of the overall credit facilities.  They claim common sense supports their expectation that, as the deemed funders of the Deposit L/C Loan Collateral Account, they be accorded, when the Deposit Letter of Credit Facility ended, payment priority over the Other Lenders who did not fund that Account.  The problem, as Appellants concede, is that, "[t]o be sure, the applicable credit documents do not expressly state [that] common-sense conclusion . . . because, unfortunately and mistakenly, the documents do not contain any express statement of who gets paid any leftover portion of the $1.25 billion." Appellants' Br. at 4.

### C.  The Intercreditor Agreement § 4.1(b) Priority Scheme

The Lenders have a first lien on TCEH's collateral.  They agreed among themselves that, once the company was in bankruptcy, they would stand on equal footing in proportion to what they loaned (they used the Latin phrases *pro rata* and *pari passu*), with no one Lender "entitled to any preferences or priority over any other . . . (*except as otherwise provided in Section 4.1 [of the Intercreditor Agreement]*)." Intercreditor Agreement § 2.1 (emphasis added).

6

Thus the priority of distribution for the funds in the Deposit L/C Loan Collateral Account (those funds are called the "Deposit L/C Collateral") is governed by § 4.1 of the Intercreditor Agreement. The section contains a pair of "waterfall" provisions. They describe the order of payments from specified funds; once the amounts due at the first level are completely satisfied, then the funds flow over the waterfall to the next level, which must also be satisfied before funds can flow to the next level, and so on.

The first waterfall, in subsection (a), which governs the distribution of all funds other than the funds in the Deposit L/C Loan Collateral Account, is not relevant for our analysis. The second waterfall, found in subsection (b), governs distribution of the Deposit L/C Collateral. It is a five-tier "waterfall" provision that states the funds shall be applied:

> first, on a pro rata basis, to the payment of all amounts due to the Deposit Letter of Credit Issuer under any of the Financing Documents, excluding amounts payable in connection with any unreimbursed amount under any Letter of Credit;
>
> second, on a pro rata basis, to the payment of all amounts due to the Deposit Letter of Credit Issuer in an amount equal to 100% of the Unpaid Drawings under any Deposit Letter of Credit;
>
> third, on a pro rata basis, to any Secured Party which has theretofore advanced or paid any fees to the Deposit Letter of Credit Issuer, other than any amounts covered by priority second, an amount equal to the amount thereof so advanced or paid by such Secured Party and for which such Secured Party has not been previously reimbursed;
>
> fourth, on a pro rata basis, to the payment of all other Deposit L/C Obligations; and
>
> last, the balance, if any, after all of the Deposit L/C Obligations have been indefeasibly paid in full in cash, as set forth above in Section 4.1(a).

7

Intercreditor Agreement § 4.1(b) (emphases in original).  In simple language, financing fees owed to the Deposit Letter of Credit Issuer come first; second are unreimbursed amounts on Deposit Letters of Credit already issued; third are any Lender's advances or payments of fees owed to the Deposit Letter of Credit Issuer by TCEH and not reimbursed; what is fourth in priority is discussed below; and, last, any remaining amounts are remitted *pro rata* to the general Lenders per § 4.1(a) (in effect, the waterfall covering collateral other than the Deposit L/C Collateral).  Appellants claim to be owed a priority payment at the fourth level, which directs the satisfaction of "all other Deposit L/C Obligations."

There are two components to the Deposit L/C Obligations.  "[A]t any date of determination" these are "the aggregate Stated Amount of all outstanding Deposit Letters of Credit plus the aggregate principal amount of all Unpaid Drawings under all Deposit Letters of Credit." Credit Agreement § 1.1 (emphasis in original).  As the Stated Amount includes "the maximum amount from time to time available to be drawn thereunder, determined without regard to whether any conditions to drawing could then be met," *id.*, a Deposit Letter of Credit Issuer still obligated to pay amounts that TCEH's creditors could draw under outstanding Deposit L/Cs would be derelict not to require reimbursement priority for those potential payments.

Also included in the Stated Amount are, as noted in the second waterfall priority, sums on drawn Deposit Letters of Credit for which TCEH has yet to reimburse the Issuer. This second part can only be owed by TCEH to Citibank as reimbursement for any drawings under a Deposit Letter of Credit.  The parties agree that Appellants cannot be

8

owed this portion of the Deposit L/C Obligations, as they never issued a Deposit Letter of Credit.

Another way to think about the Deposit L/C Obligations is that they correspond to TCEH's potential liability to Citibank as the Deposit Letter of Credit Issuer. The Unpaid Drawings are the amounts currently due, and added to those amounts are the outstanding Deposit L/Cs that might later result in Unpaid Drawings. The aggregate is a changing figure that can be pinned down only at a "date of determination."

### D. The Credit Agreement § 3.9 Security Interests

Section 3.9 of the Credit Agreement grants security for the Deposit L/C Obligations and, for that reason, may aid in construing that term. Section 3.9 begins by stating that the Deposit L/C Loan Collateral Account exists "for the purpose of cash collateralizing [TCEH]'s obligations to the Deposit Letter of Credit Issuer in respect of the Deposit Letters of Credit." Next, the Collateral Agent (*i.e.*, Citibank in that capacity) is granted two security interests in the Account. The first is "for the benefit of all Deposit Letter of Credit Issuers . . . as security for the Deposit L/C Obligations[.]" The second security interest is "in addition . . . for the benefit of the Secured Parties as collateral security for the Obligations."

The second interest is a catch-all. Per the definitional section, "Obligations" refers to every obligation stemming from the credit documents, and "Secured Parties" includes, among others, the Lenders in the loan transactions. The second grant, therefore, secures everything (including the Deposit L/C Obligations) owed under the credit documents.

9

The second security interest is qualified by a tiered repayment priority that preserves the primacy of Citibank's rights to the Deposit L/C Collateral Account; the "amounts on deposit" in the Account must first be used to repay Deposit L/C Obligations "in respect of Citibank Deposit Letters of Credit." Next, the funds can go toward the Deposit L/C Obligations in respect of "all other Deposit Letters of Credit." Finally, the amounts can be used "to repay all other Obligations."[1] Funds in the Account can be remitted to TCEH only "after the termination or cancellation of all Deposit Letters of Credit and the repayment in full of all outstanding Deposit L/C Loans [known also as the Deposit Letter of Credit Facility] and Deposit L/C Obligations." *Id.*[2]

### E. The Bankruptcy Court's Decision

Appellants filed a complaint in the Bankruptcy Court seeking a declaration that they had priority rights to the undrawn Deposit L/C Collateral, and the Defendants-Appellees responded with a motion to dismiss. As noted in more detail below, the Bankruptcy Court previously held that the conditions precedent to the 4.1 waterfall's applicability were not satisfied. It followed this holding in our case. *In re Energy Future Holdings Corp.*, 548 B.R. 79, 90 (Bankr. D. Del. 2016). As a result, it explained, the Bankruptcy Code, Court orders, and the plan of reorganization governed the distribution of the Deposit L/C Collateral. *Id.*

---

[1]    There is also a repayment priority applicable to accounts set up to facilitate the addition of Deposit Letter of Credit Issuers other than Citibank. As noted, no other issuer signed up.

[2]    The parties mention in passing other provisions of the credit documents to support their positions, but no one appears particularly relevant to our decision.

10

Alternatively, the Court determined that the plain language of the Intercreditor Agreement does not give Appellants any payment priority. It reasoned that the fourth level of the 4.1(b) waterfall was a catch-all designed to protect the Deposit L/C Issuer and that the Deposit L/C Obligations included only the obligations related to Deposit Letters of Credit despite the definition's failure to identify a payee expressly. *Id.* at 93–94.

**F. The District Court's Decision**

The District Court affirmed. Unlike the Bankruptcy Court, the District Court, on request of the parties, did not consider whether the conditions precedent to distribution under the § 4.1 waterfall had been met. (Appellants ask that we also avoid this issue, and we will oblige.[3]) Rather, the Court focused on whether, assuming the § 4.1 waterfall

---

[3] This bankruptcy set of cases has spun off many other opinions. There are inevitably some overlapping issues—the question of whether the § 4.1 waterfall is inapplicable is one of these. In two opinions in a case between different parties than those before us, the Bankruptcy Court ruled on that issue. *See Delaware Trust Co. v. Wilmington Trust, N.A. (In re Energy Futures Holdings Corp.)*, 546 B.R. 566, 578-84 (Bankr. D. Del. 2016); *Delaware Trust Co. v. Wilmington Trust, N.A. (In re Energy Futures Holdings Corp.)*, 566 B.R. 669, 683-88 (Bankr. D. Del. 2017). We understand its ruling has been appealed to our Circuit, but briefing is in the early stages.

As noted, the parties asked the District Court to rule only on the question of whether the Deposit L/C Lenders had a priority interest in the Deposit L/C Collateral. JA16. It obliged and read "the mechanics of the Section 4.1(b) Waterfall to parallel the mechanics of [S]ection 3.9 [of the Credit Agreement]." JA28. On appeal, Appellants neither included the question of the waterfall's applicability in their statement of issues nor addressed the merits of that issue in their Opening Brief. *See also* Appellants' Br. at 6 n.3. In Appellees' Brief, however, they resurrected the issue, arguing that we can alternatively affirm on the basis that the § 4.1 waterfall was inapplicable. Appellees' Br. at 3-4, 41-43.

As did the District Court, we do not consider the issue of § 4.1's applicability. *See Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 149 (3d Cir. 2016) ("a federal appellate court does not consider an issue not passed upon below" (citing *Singleton v. Wulff*, 428 U.S. 106, 120 (1976)). The parties appear to be on the same page, as but for a passing

11

applied, the Deposit L/C Lenders had a priority interest in the Deposit L/C Collateral. In that context, it relied on § 3.9 of the Credit Agreement, which distinguishes between Deposit L/C Obligations and Obligations. That section mandates that the Deposit L/C Collateral be used first to satisfy Deposit L/C Obligations associated with Citibank's Deposit Letters of Credit. Second, the Deposit L/C Collateral must be used to satisfy Deposit L/C Obligations associated with all other Deposit Letters of Credit, *i.e.*, Deposit L/C Obligations owed to other Deposit L/C Issuers (of which there were none). Any remaining Deposit L/C Collateral would go to repay all other Obligations. The District Court reasoned that, because all Deposit L/C Obligations are satisfied under the first two steps of § 3.9, and because neither of those provisions refer to Deposit L/C Lenders, they are only owed Obligations, not Deposit L/C Obligations. With this in mind, the Court surveyed the rest of the relevant provisions in the credit documents and determined that none altered this understanding.

## II. Jurisdiction, Standard of Review, and Applicable Law

We have jurisdiction under 28 U.S.C. §§ 158(d)(1) and 1291. Our review of the District Court's decision to grant a motion to dismiss, which involved legal questions of contract interpretation, is anew. *See United States v. Hardwick*, 544 F.3d 565, 570 (3d Cir. 2008).

New York law governs the contracts before us. Intercreditor Agreement § 9.10. Under it, where the contract provisions at issue are ambiguous, a motion to dismiss

---

comment of Appellants' counsel, no one raised the issue of § 4.1's applicability at oral argument. Thus we assume it applies and address the merits.

12

must be denied. *Serdarevic v. Centex Homes, LLC*, 760 F. Supp. 2d 322, 328 (S.D.N.Y. 2010). "[A] contract is ambiguous if its terms could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Chesapeake Energy Corp. v. Bank of New York Mellon Trust Co., N.A.*, 773 F.3d 110, 114 (2d Cir. 2014) (internal quotation marks omitted).

## III. Discussion

### A. Section 4.1(b) of the Intercreditor Agreement gives priority only to the Issuers

The 4.1(b) waterfall, as noted, is a five-tier provision governing the distribution of the Deposit L/C Collateral. It provides for payment priority of all amounts currently owed on the drawn Deposit Letters of Credit and all amounts which might be owed on outstanding (*i.e.*, then-undrawn) Deposit Letters of Credit. In other words, it is comprehensive. Payment of the amounts immediately due on the Deposit Letters of Credit is provided for by the first three levels of the waterfall. The Deposit L/C Collateral is applied first

> to the payment of all amounts due to the Deposit Letter of Credit Issuer . . . , excluding amounts payable in connection with any unreimbursed amount under any Letter of Credit . . . .

Intercreditor Agreement § 4.1(b). Then

> to the payment of all amounts due to the Deposit Letter of Credit Issuer in an amount equal to 100% of the Unpaid Drawings under any Deposit Letter of Credit . . . .

13

*Id.* And third in priority is

> any Secured Party which has theretofore advanced or paid any fees to the Deposit Letter of Credit Issuer . . . an amount equal to the amount thereof so advanced or paid . . . .

*Id.*

The parties agree that these levels describe only TCEH's obligations to the Deposit Letter of Credit Issuer and any eligible entity that spotted fees owed to Citibank as the Issuer.

Our take is that the first three priority levels describe all that TCEH then owed in relation to the Deposit Letters of Credit. They, however, do not reach contingent liability on outstanding Deposit Letters of Credit—those amounts are neither "due," "payable," "advanced," nor "paid." And there was no guarantee that every Deposit Letter of Credit would be off the table at the time (or times) the parties paid out the Deposit L/C Collateral. An outstanding Deposit Letter of Credit might have had a maturity date up to a year in the future. Though there may at the time be no "amounts due" on the Deposit L/Cs, it was almost certain to be drawn when the bankrupt TCEH failed to pay. Citibank then would be on the hook, even after the insolvency case began, for the amount owed by TCEH to a third party backed by a Deposit L/C. Without access to the Deposit L/C Collateral, Citibank would need to seek repayment from the general collateral as a general creditor. It is hard to imagine the parties did not plan to avoid this scenario, as there is little use for security that is not available in times of financial distress.

Thus the fourth priority comes into play to secure with the Deposit L/C Collateral the contingent obligations on outstanding Deposit Letters of Credit. The funds, as noted, are applied "to the payment of all other Deposit L/C Obligations." Read along with the

14

definition of Deposit L/C Obligations, the fourth priority allows the payment of "all Unpaid Drawings" "at any date of determination[.]" When a drawing is later made, the amount owed to Citibank can be "determin[ed]" and paid. This security for the Deposit L/C Obligations provides continued dollar-for-dollar support while the Deposit Letter of Credit Facility winds down.

The crux of Appellants' claim—that the fourth priority is redundant if it does not provide for payment to a party other than the Deposit Letter of Credit Issuer because, by the time it is reached, Citibank has been paid all the amounts either payable or outstanding—relies on their misapprehension about contingent liability being determined. As explained above, "determining" liabilities does not convert amounts that could one day be drawn on outstanding Deposit L/Cs "at any date of determination" into "amounts due" and therefore payable under the earlier priorities. The fourth priority is there to provide for those outstanding, and contingent, amounts.

Section 4.1(b) sets out provisions aimed exclusively at protecting Deposit Letter of Credit Issuers. And the fourth level, where the claimed entitlement is located, seems far from "meaningless," as Appellants argue. Appellants' Br. at 36. Citibank, as the Issuer, got continued security if any of its Deposit Letters of Credit were still outstanding. The Appellants – successors to Lenders, not Issuers – do not appear to fit anywhere within this scheme. The fifth priority level remits the remaining funds to the general pool of ordinary collateral for normal distribution to all Lender parties. Appellants can collect their *pro rata* share there, but only after Citibank is paid any amounts owed to it as the Issuer at the fourth priority level. If, as Appellants argue, nothing is needed to pay

15

Citibank under the fourth priority level because no previously undrawn L/Cs are later drawn, so much the better, as there may be funds still in the Deposit L/C Collateral Account. But Appellants' sharing with all Lenders is *pro rata*, for it enjoys no payment priority over them.

### B. The security interests granted by § 3.9 of the Credit Agreement

Section 3.9 of the Credit Agreement was dealt with in depth by the District Court. Rather than repeat here that comprehensive analysis, suffice it to say § 3.9 supports strongly that § 4.1(b) does not give priority to any party other than a Deposit Letter of Credit Issuer. Section 3.9 explains that the purpose of the Deposit L/C Loan Collateral Account is to secure TCEH's obligations to the Deposit Letter of Credit Issuers, and then it gives those Issuers a right to be paid first from the funds in the Account. All other parties, including Appellants, are given an equal right to any remaining funds as collateral for the other Obligations. Again, Appellants' sharing with all Lenders is *pro rata*.

### C. Other provisions

"Admittedly, the farther afield from the key provisions of the Credit Documents one travels, the more remote are the signals as to whether Appellants' or Appellees' arguments for payment priority are correct." Appellants' Br. at 45. Appellants have scoured the credit documents searching for contrary meaning in far-flung provisions. For instance, they ask us to find an implicit structure in the nomenclature selected for the defined terms—Obligations versus Deposit L/C Obligations, and the like. But the principal action is in the sections noted above. If these highly sophisticated parties had

16

intended for Deposit L/C Collateral to be paid to the Deposit L/C Lenders, then they would have specifically said so in those operative provisions.

*   *   *   *   *

Our "primary objective . . . is to give effect to the intent of the parties as revealed by the language of their agreement." *Chesapeake Energy Corp.*, 773 F.3d at 113–14.  The Intercreditor Agreement § 4.1(b) waterfall requires the Deposit L/C Collateral be used first to pay off amounts due to the Deposit Letter of Credit Issuer (Citibank), then the amounts due to Secured Parties who advanced fees to the Issuer by TCEH.  The remaining funds are set aside in an amount equal to the Issuer's contingent liability on outstanding Deposit Letters of Credit and remain available to reimburse the Issuer for any subsequent drawings.  This is a protection for the Issuer, not the Deposit L/C Lenders.  Section 3.9 of the Credit Agreement reinforces that conclusion.

The judgment of the District Court is affirmed.

17