# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| WILMINGTON – 5190 BRANDYWINE PARKWAY, LLC, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No.: N17C-04-060 EMD CCLD |
| ACADIA BRANDYWINE HOLDINGS, LLC, | ) ) ) ) | |
| Defendant. | ) ) ) | |

|  |  |  |
|---|---|---|
| WILMINGTON – 5190 BRANDYWINE PARKWAY, LLC, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | C.A. No.: N17C-04-061 EMD CCLD |
| ACADIA REALTY LIMITED PARTERNSHIP, | ) ) ) | |
| Defendant. | ) ) | |

Submitted: October 25, 2019
Decided: February 7, 2020

*Upon Plaintiff's Motion for Summary Judgment*
***GRANTED in part and DENIED in part***

*Upon Defendants' Cross-Motion for Summary Judgment*
***DENIED***

Michael J. Barrie, Esq., Stephen M. Ferguson, Esq., William M. Alleman, Jr., Esq., Benesch, Friedlander, Coplan & Aronoff LLP, Wilmington, Delaware, Helen Gavaris, Loeb & Loeb LLP, New York, New York, *Attorneys for Plaintiff.*

Andrew D. Cordo, Esq., Wilson Sonsini Goodrich & Rosati, Wilmington, Delaware, Adam C. Silverstein, Esq., Rebecca E. Algie, Esq., Otterbourg P.C., New York, New York, *Attorneys for Defendants.*

**DAVIS, J.**

## I. INTRODUCTION

This contract action is assigned to the Complex Commercial Litigation Division of the Court. Acadia Brandywine Holdings, LLC ("Holdings") borrowed money from Bear Stearns Commercial Mortgage, Inc. ("Original Lender"). The Original Lender and Holdings executed a Loan Agreement and a Promissory Note (collectively "Loan Documents"). Simultaneously with the execution of the Loan Documents, Acadia Realty Limited Partnership ("Acadia") executed and delivered a guaranty agreement (the "Guaranty") to the Original Lender.[1] Subsequently, the Original Lender assigned its rights to collection under the Loan Documents to Wilmington – 5190 Brandywine Parkway, LLC ("Parkway").

Parkway filed separate lawsuits against Holdings[2] and Acadia,[3] seeking recourse liability against Holdings and Acadia (collectively "Defendants"). The Court joined the related claims. Parkway also filed a claim in the Court of Chancery asserting that parcels were mistakenly left out of the Loan Documents and asked the Court of Chancery for reformation of the Loan Documents. Defendants filed cross-motions for summary judgment under the Loan Documents and Guaranty ("Parkway's Motion," "Defendants' Motion," and collectively the "Motions").

---

[1] The parties have agreed that the Loan Documents and Guaranty are governed by New York law.
[2] The Second Amended Complaint for Judgment on Promissory Note. Hereinafter referred to as the "Brandywine Complaint ¶ __."
[3] The Second Amended Complaint for Judgment on Guaranty Agreement. Hereinafter referred to as the "Acadia Complaint ¶ __." The Brandywine Complaint and the Acadia Complaint collectively shall be referred to as the "Complaints."

For the reasons set forth below, the Court will (i) **GRANT in part** and **Deny in part** Parkway's Motion and (ii) **DENY** Defendants' Motion. The Court finds that Defendants, in part, violated provisions under the Loan Agreement and Guaranty—those relating to conveying interests in property (easements, covenants running with the land and insurance proceeds) but not those relating to the Sterling Mortgage,[4] fee title interests to the Red Robin, or admissions of insolvency.

## II. RELEVANT BACKGROUND

### A. Factual Background

The Original Lender loaned Holdings $26,250,000 (the "Loan"). The Original Lender and Holdings executed the Loan Documents on June 2, 2006.[5] The Loan was made contemporaneously with three other loans as part of Acadia's refinancing of the debt on a shopping center known as Brandywine Town Center in New Castle County (the "Shopping Center").[6] The Shopping Center was divided into legally distinct parcels owned by four entities that Acadia controlled and partially owned. Under substantively identical loan documents from the same lender, each of these four entities obtained a separate loan secured by a mortgage on the parcels it owned and guaranteed by Guarantor.[7]

Additionally, Acadia executed the Guaranty, guaranteeing the debt as set forth in the Guaranty.[8] Under the Guaranty, Acadia is personally liable to Parkway for the Loan only if certain conditions are met (the "Guaranteed Obligations").[9] The Guaranteed Obligations include

---

[4] The "Sterling Mortgage" means that agreement between Sterling Bank and The Colby Restaurant Group, Inc. ("Colby").

[5] Brandywine Compl., Ex. B (the "Agreement"); Brandywine Compl., Ex. C (the "Note"); Brandywine Compl., Ex. D (the "Mortgage"). Hereinafter collectively referred to as the "Loan Documents."

[6] *See* Alleman Aff. Ex. 4 & Ex. 5 (the "Blacksberg Dep.") at 29:19-22; 37:18 – 38:5.

[7] *See* Alleman Aff. Ex. 6.

[8] Brandywine Compl., Ex. E. Hereinafter referred to as the "Guaranty."

[9] Guaranty at 1.2.

liability for the entire outstanding debt if Holdings: (a) "admit[s], in writing or in any legal proceeding, its insolvency or inability to Pay its debts as they become due;" (b) "fails to maintain its status as a Single Purpose Entity . . ."; (c) "fails to obtain [Parkway's] prior written consent to any subordinate financing or other voluntary lien encumbering the Property;" or (d) "fails to obtain [Parkway's] prior written consent to any assignment, transfer, or conveyance of the Property or any interest therein as required by the Loan Agreement or the Security Instruments."[10]

Article II of the Guaranty addresses events and circumstances that do not reduce of discharge Acadia's obligations under the Guaranty.[11] Article II provides:

> [Acadia] hereby consents and agrees to each of the following, and agrees that [Acadia's] obligations under this Guaranty shall not be released, diminished, impaired, reduced or adversely affected by any of the following, and waives any common law, equitable, statutory or other rights (including without limitation rights to notice) which [Acadia] might otherwise have as a result of or in connection with any of the following:
>
> . . .
>
> 2.13    Other Actions Taken or Omitted. Any other action taken or omitted to be taken or omitted to be taken with respect to the Loan Documents, the Guaranteed Obligations, or the security and collateral therefor, whether or not such action or omission prejudices [Acadia] or increases the likelihood that [Acadia] will be required to pay the Guaranteed Obligations pursuant to the terms hereof, it is the unambiguous and unequivocal intention of [Acadia] that [Acadia] shall be obligated to pay the Guaranteed Obligations when due, notwithstanding any occurrence, circumstance, event, action, or omission whatsoever, whether contemplated or uncontemplated, and whether or not otherwise or particularly described herein, which obligation shall be deemed satisfied only upon the full and final payment and satisfaction of the Guaranteed Obligations.[12]

The Loan Agreement also contains an "Exculpation" section.[13] The Exculpation provision requires the lender to foreclose on the property rather than collect from Holdings

---

[10] Guaranty at 1.2(b)(E).
[11] Guaranty Art. II.
[12] Guaranty at 2.13.
[13] Loan Agreement Sec. 9.3.

individually for a failure to pay. However, recourse liability is triggered if certain conditions are met.[14] Specifically, Section 9.3 states:

> (B) the Debt shall be fully recourse to [Holdings] (i) in the event of: (a) [Holdings] filing a voluntary petition under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (b) the filing of an involuntary petition against [Holdings] under the Bankruptcy Code or any other federal or state bankruptcy or insolvency law, in which [Holdings] colludes with, or otherwise assists such Person, or solicits or causes to be solicited petitioning creditors for any involuntary petition against [Holdings] from any Person; (c) [Holdings] filing an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other Person under the Bankruptcy Code or any other federal or state bankruptcy or insolvency law; (d) [Holdings] consenting to or acquiescing in or joining in an application for the appointment of a custodian, receiver, trustee, or examiner for borrower or any portion of the Property; (e) [Holdings] making an assignment for the benefit of creditors, or admitting, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due; (ii) if the first full monthly payment of principal and interest on the Note is not paid when due; (iii) if [Holdings] fails to maintain its status as a Single Purpose Entity after the Guaranty Notice (as defined the Guaranty) if [Holdings] fails to permit on-site inspections of the Property, fails to provide financial information, or fails to appoint a new property manager upon the request of [Parkway] as permitted under this Agreement, each as required by, and in accordance with, the terms and provisions of the Agreement or the Mortgage; (iv) if [Holdings] fails to obtain [Parkway's] prior written consent to any Indebtedness or voluntary Lien encumbering the Property; or (v) if [Holdings] fails to obtain [Parkway's] prior written consent to any Transfer as required by this Agreement or the Mortgage.[15]

A "Transfer" occurs when either Holdings or Acadia does any of the following: "sell, convey, mortgage, grant, bargain, encumber, pledge, assign...or otherwise transfer or dispose of...the Property or any part thereof or any legal or beneficial interest therein."[16] The Loan Agreement specifies that "[Parkway] shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable."[17]

---

[14] Loan Agreement Sec. 9.3.
[15] *Id.*
[16] *Id.* Sec. 5.2.10(b).
[17] *Id.* Sec. 5.2.10(f).

According to Parkway, on January 16, 2008, Holdings mortgaged its interest in any improvements on the Property to General Electric Capital Corporation.[18] Parkway alleges that Holdings did not obtain Parkway's consent for the transfer of interest.[19]

The Loan matured on July 1, 2016 and Holdings failed to pay the principal, accrued interest, default interest, and late fees (collectively "Debt").[20] On April 6, 2016, Acadia and Parkway acknowledged that "(a) an Event of Default has occurred and is continuing under the Loan Documents due to Borrower's failure to pay all amounts when due as required under the Loan Documents; (b) the Debt is due and payable in full; and (c) the Loan Documents to which [Acadia] and [Holdings] are parties constitute the valid and legally binding obligations of [Acadia] and [Holdings], respectively, [are] enforceable in accordance with their respective terms."[21]

Additionally, on April 6, 2016, Acadia and Holdings agreed in writing that "there are not sufficient funds available to [Holdings] to timely pay such Third Party Expenses . . . ."[22] Defendants acknowledged insufficient funds again on May 6, 2016 and June 9, 2016. On November 21, 2017, Holdings sued Parkway in New York state court.[23] Holdings sought an injunction compelling Parkway to advance operating costs.[24] Holdings stated it could not pay other creditors because Parkway took all proceeds from Holdings' tenants and used the money to pay down the Loan.[25]

---

[18] Acadia Compl. ¶ 50.
[19] *Id.* ¶ 51.
[20] Acadia Compl. ¶ 13
[21] Acadia Compl. ¶ 28; Brandywine Compl. ¶ 30.
[22] Brandywine Compl., Ex E.
[23] Acadia Compl. ¶¶ 33-34; Brandywine Compl. ¶¶ 33-34.
[24] Supp. Resp. at 8.
[25] *Id.*

On April 29, 2016, Holdings granted an easement to a third party[26] over a Parcel of the Property (the "Reciprocal Agreement").[27] Specifically, the Reciprocal Agreement states:

> [Subsidiary] hereby grants to [Holding] an easement over all portions of Parcel C-1 which the existing improvements have been designed to support Parcel C-2, or any portion thereof for continuous, total, adequate and safe support of all portions of the improvements existing on Parcel C-2 as of the execution of this Reciprocal Agreement.

> [Holdings] hereby grants to [Subsidiary] an easement over all portions of Parcel C-2 which the existing improvements have been designed to support Parcels C-2A or C-3, or any portion thereof for continuous, total, adequate and safe support of all portions of the improvements existing on Parcels C-2A and C-3 as of the execution of this Reciprocal Agreement.[28]

Further, the Reciprocal Agreement grants:

> a perpetual easement and right of access to all portions of [the shopping center] to the extent that such access is necessary or desirable to permit such Owner to maintain, repair or replace any portion of the property which such Owner is responsible to maintain, repair or replace, provided that: except for any emergency repairs necessary to prevent damage or injury to persons or property, such right of access shall not be exercised without prior consultation of the Owner of the area which is to be entered on; provided further that such right of access shall be exercised in such fashion as shall minimize any interference with the operation of the area entered upon.[29]

According to the Defendants, the Original Lender consented to a similar agreement in 2006 (the "2006 Declaration").[30] The 2006 Declaration allowed Subsidiary a cross-easement "to install, repair, maintain, remove and replace any plumbing, heating, cooling, lighting or similar fixture or equipment . . . [as long as the improvement] shall not impair the structural integrity of the building or adversely affect any adjacent Lot."[31]

---

[26] Acadia Brandywine Subsidiary ("Subsidiary").
[27] Brandywine Compl., Ex. I. Hereinafter referred to as the "Reciprocal Agreement § __."
[28] Reciprocal Agreement § 2.1.
[29] Reciprocal Agreement § 2.2.
[30] Defs. Mot., Ex. 3.
[31] Reciprocal Agreement § 4.3(a).

Holdings also executed a ground lease estoppel certificate and consent (the "Ground Lease") on February 13, 2017.[32] The Ground Lease allows Subsidiary to mortgage Subsidiary's interest in the ground lease and any improvements on the property. Parkway asserts that it did not consent to the Ground Lease. Further, Parkway asserts that "[u]pon information and belief, [Parkway's] predecessors in interest, as applicable, did not consent to the [Ground Lease]."[33]

The description of the Ground Lease is "[t]hat certain Net Ground Lease dated as of December 11, 2006 with respect to the Premises between Ground Lessor and Borrower, as amended and supplemented by the following documents: None."[34] A previous ground lease was executed on December 11, 2006 (the "2006 Ground Lease").[35] Pursuant to the 2006 Ground Lease, Holdings leased premises to Colby for the purpose of building and operating a Red Robin restaurant. That 2006 Ground Lease gave Subsidiary rights in the Property. The 2006 Ground Lease provided Subsidiary an option to renew the 2006 Ground Lease for three additional five-year terms.[36]

### B. Procedural History

Parkway filed two lawsuits with the Court to collect the principal, accrued interest, default interest, and late fees (collectively "Debt") from Defendants. Parkway filed suit against Holdings to collect on the Note. Parkway also filed suit against Acadia to collect on the Guaranty. The Court joined the cases.

Additionally, Parkway filed a complaint in the Court of Chancery seeking to reform and foreclose on the mortgage (the "Chancery Action") on April 6, 2017.[37] Parkway asserts that

---

[32] Brandywine Am. Compl., Ex. N. Ex. N shall be referred to as the "Ground Lease."
[33] Acadia Compl. ¶ 38; Brandywine Compl. ¶38.
[34] 2006 Ground Lease, Ex. B.
[35] Brandywine Compl., Ex. M. Hereinafter referred to as the "2006 Ground Lease").
[36] 2006 Ground Lease § 34.
[37] *Wilmington – 5190 Brandywine parkway, LLC v. Acadia Brandywine Holdings, LLC*, 2017-0263-MTZ (Del. Ch.). Hereinafter referred to as the "Chancery Action."

parcels were mistakenly left out of the Loan Documents. Specifically, Parkway seeks: (1) reformation of the mortgage; (2) foreclosure upon the mortgage; and (3) appointment of a receiver to manage the mortgaged property in the interim.[38]

After filing the various lawsuits, Parkway requested that Holdings replace the existing property manager as required upon request under the Loan Documents on June 8, 2017.[39] Parkway again requested that Holdings replace the property manager on September 29, October 13, and October 20, 2017.[40] As of January 16, 2018—the filing of the Second Amended Complaint—Holdings has not replaced the property manager.

On November 21, 2017, Holdings filed an action in New York (the "New York Action"). In the New York Action, Holdings sought a temporary restraining order and preliminary injunction compelling Parkway to release rents so that Holdings could pay property expenses and otherwise preserve the Property.[41]

On April 1, 2019, Parkway filed Plaintiff's Opening Brief in Support of its Motion for Summary Judgment ("Parkway's Motion"). Then, on May 1, 2019, Defendants jointly filed Opening Brief in Support of Defendants' Cross-Motion for Summary Judgment and Answering Brief in Opposition to Plaintiff's Motion for Summary Judgment ("Defendants' Motion"). After, on May 31, 2019, Parkway filed Plaintiff's Reply Brief (I) in Further Support of its Motion for Summary Judgment and (II) in Opposition to Defendants' Cross-Motion for Summary Judgment. Finally, on June 14, 2019, Defendants filed Reply Brief in Further Support of Defendants' Cross-Motion for Summary Judgment. On August 14, 2019, the Court held a hearing on the Parkway Motion and Defendants' Motion. At the conclusion of the hearing, the Court took the matters

---

[38] Chancery Action, D.I. 1. Hereinafter referred to as the "Chancery Complaint."
[39] Acadia Compl. ¶ 75.
[40] *Id.* ¶ 76.
[41] Supp. Mot. at 5.

under advisement.  On October 21, 2019, Defendants filed a letter that purported to supplement Defendants' Motion, arguing that a new case, *Urdan v. WR Capital Partners, LLC*,[42] provided additional guidance on issues already raised and briefed.  Parkway responded to that letter on October 25, 2019.

## III. STANDARD OF REVIEW

The standard of review on a motion for summary judgment is well-settled.  The Court's principal function when considering a motion for summary judgment is to examine the record to determine whether genuine issues of material fact exist, "but not to decide such issues."[43] Summary judgment will be granted if, after viewing the record in a light most favorable to a nonmoving party, no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.[44] If, however, the record reveals that material facts are in dispute, or if the factual record has not been developed thoroughly enough to allow the Court to apply the law to the factual record, then summary judgment will not be granted.[45] The moving party bears the initial burden of demonstrating that the undisputed facts support his claims or defenses.[46] If the motion is properly supported, then the burden shifts to the non-moving party to demonstrate that there are material issues of fact for resolution by the ultimate fact-finder.[47]

Where, as here, the parties have filed cross motions for summary judgment and have not argued that there are genuine issues of material fact, "the Court shall deem the motions to be the

---

[42] 2019 WL 3891720 (Del. Ch. Aug. 19, 2019).
[43] *Merrill v. Crothall-American Inc.*, 606 A.2d 96, 99-100 (Del. 1992) (internal citations omitted); *Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc.*, 312 A.2d 322, 325 (Del. Super. 1973).
[44] *Id.*
[45] *Ebersole v. Lowengrub*, 180 A.2d 467, 470 (Del. 1962); *see also Cook v. City of Harrington*, 1990 WL 35244 at *3 (Del. Super. Feb. 22, 1990) (citing *Ebersole*, 180 A.2d at 467) ("Summary judgment will not be granted under any circumstances when the record indicates . . . that it is desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances.").
[46] *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1970) (citing *Ebersole*, 180 A.2d at 470).
[47] *See Brzoska v. Olsen*, 668 A.2d 1355, 1364 (Del. 1995).

equivalent of a stipulation for decision on the merits based on the record submitted with the motions."[48] Neither party's motion will be granted unless no genuine issue of material fact exists and one of the parties is entitled to judgment as a matter of law.[49]

## IV. DISCUSSION

The parties agree that New York law applies to the Loan Documents.[50] Unless otherwise noted, the Court will apply New York law for contract construction and interpretation in this civil litigation. "Under New York law, the initial interpretation of a contract is a matter of law for the court to decide. Where the agreement is unambiguous, a court may not admit extrinsic evidence and interprets the plain language of the agreement as a matter of law."[51] "However, 'when the language of a contract is ambiguous, its construction presents a question of fact,' which of course precludes summary dismissal."[52]

"[T]he mere fact that the Parties disagree on the proper interpretation of the contract does not render the contractual language ambiguous."[53] "Contract language is not ambiguous if it has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'"[54] "[A] term is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."[55]

---

[48] Super. Ct. Civ. R. 56(h).
[49] *E.I. DuPont de Nemours and Co. v. Medtronic Vascular, Inc.*, 2013 WL 261415, at *10 (Del. Super. Jan. 18, 2013).
[50] *See* Agreement Sec. 10.3; Parkway's Mot. at 6; Note Art. 9; Defs. Mot. at 9; Resp. at 10.
[51] *Serdarevic v. Centex Homes, LLC*, 760 F. Supp. 2d 322, 328 (S.D.N.Y. 2010).
[52] *Bank of Am. Corp. v. Lemgruber,* 385 F. Supp. 2d 200, 226 (S.D.N.Y. 2005).
[53] *Serdarevic,* 760 F. Supp. 2d at 329.
[54] *Id.*
[55] *Prior v. Innovative Commc'ns Corp.*, 207 Fed. Appx. 158, 163 (3d Cir. 2006) (interpreting New York law).

11

"Under New York law, written agreements are construed in accordance with the parties' intent and '[t]he best evidence of what parties to a written agreement intend is what they say in their writing.'"[56] "The entire contract must be reviewed and particular words should be considered, not as if isolated from the context, but in the lights of the obligation as a whole and the intention of the parties as manifested thereby. Form should not prevail over substance and a sensible meaning of words should be sought."[57] "Words and phrases used in an agreement must be given their plain meaning . . . ."[58] "The rules of construction of contracts require us to adopt an interpretation which gives meaning to every provision of a contract or, in the negative, no provision of a contract should be left without force and effect."[59] "Even if there was an inconsistency between a specific provision and a general provision of a contract . . . the specific provision controls."[60]

## A. Parkway is Entitled to Partial Summary Judgment on Liability

### 1. *The Full Recourse Provisions of the Loan Agreement and Guaranty Are Clear and Unambiguous.*

Parkway cites numerous cases which stand for the proposition that recourse provisions are valid in loan agreements so long as the recourse provisions are clear and unambiguous. The Defendants do not rebut the proposition that the recourse provisions of Loan Agreement and the Guaranty are clear and unambiguous. The Court finds that, if triggered, the recourse provisions in the Loan Agreement and Guaranty are unambiguous and enforceable.

---

[56] *Schron v. Troutman Sanders LLP,* 20 N.Y.3d 430, 963 N.Y.S.2d 613, 986 N.E.2d 430, 433 (2013).
[57] *Riverside S. Plan. Corp. v. CRP/Extell Riverside, L.P.*, 920 N.E.2d 359, 363 (N.Y. 2009) (quoting *Atwater & Co. v. Panama R.R. Co.*, 246 N.Y. 519, 524 (1927)) (internal quotations omitted).
[58] *Bianco v. Bianco*, 36 A.D.3d 490, 491, 830 N.Y.S.2d 21 (N.Y. App. Div. 2007).
[59] *Muzak Corp. v. Hotel Taft Corp.*, 133 N.E.2d 688, 690 (N.Y. 1956); *see also In re El-Roh Realty Corp.*, 902 N.Y.S.2d 727, 729 (N.Y. App. Div. 4th Dept. 2010) ("The contract must be read as a whole to determine its purpose and intent and it should be interpreted in a way that reconciles all its provisions, if possible) (internal quotations omitted").
[60] *Id.*

12

## 2. *Conditions Triggering Full Recourse Under the Loan Agreement and Guaranty Have Occurred.*

Parkway argues that Holdings triggered full recourse under the Loan Agreement and Guaranty because Holdings (i) transferred interests in the Property by creating easements, covenants and allocating insurance proceeds in the Reciprocal Agreement, (ii) encumbered the Property by consenting to the Sterling Mortgage, (iii) transferred an interest in the improvements to the Property in the Estoppel, and (iv) admitted that Holdings could not pay its debts when due.

### i. *The Reciprocal Agreement Conveyed Interests in the Property Without Lender's Consent.*

Under Section 9.3(v) of the Loan Agreement, Holdings triggers full recourse if Holdings does not obtain Parkway's written consent prior to "any Transfer as required by this Agreement or the Mortgage."[61] Similarly, under Section 1.2(b) of the Guaranty, Holdings triggers full recourse if Holdings "if Holdings fails to obtain Parkway's prior written consent to any assignment, transfer, or conveyance of the Property or any interest therein as required by the Loan Agreement or the Security Instruments."[62]

#### a. Easements

Parkway contends that the Defendants triggered full recourse against Holdings and Acadia by executing the Reciprocal Agreement, which was a transfer or conveyance of interests in the Property. Parkway asserts that this was because the Reciprocal Agreement conveyed easements, affirmative covenants, and rights to the Property's insurance proceeds to the owners of the rest of the Shopping Center.

In response, Defendants cite Section 8.3 of the Reciprocal Agreement which states, "in the event of any conflict between the terms [of the Reciprocal Agreement] and the terms of the

---

[61] Loan Agreement Sec. 9.3(B)(e)(v).
[62] Guaranty at 1.2(b).

13

2006 Declaration, the terms of the 2006 Declaration shall govern and control."[63] Using this provision, Defendants assert that any new easements or covenants created by the Reciprocal Agreement are superseded by the 2006 Declaration. Next, Defendants argue that the parties did not intend to alter the rights in the 2006 Declaration. As per the 2006 Declaration, "covenants may not be modified, amended or altered in whole or in part, except by... the consent of the New Castle County Council . . . ." Defendants note the fact that the parties did not seek or obtain the consent of the New Castle County Council in executing the Reciprocal Agreement shows that they did not intend to modify the 2006 Declaration.

Parkway argues that Defendants' interpretation of the Reciprocal Agreement is contrary to New York courts' rules to read a contract to give effect to all of the contract's provisions. In addition, Parkway contends that the parties did not need the consent of the New Castle County Council to sign the Reciprocal Agreement because (i) the 2006 Declaration is an amended declaration, (ii) New Castle County did not sign the 2006 Declaration, and (iii) both parties agree that the Reciprocal Agreement is the controlling agreement.

First, the Reciprocal Agreement creates an easement. "An easement is an interest in land...which confers a right upon the holder thereof to some profit, benefit, dominion, enjoyment or lawful use out of or over the estate of another."[64] "An easement . . . is permanent in nature."[65] Parties may create an express easement in a "writing...demonstrating that intent, signed by the grantor."[66]

---

[63] Reciprocal Agreement Sec. 8.3.
[64] *Copertino v. Ward*, 473 N.Y.S.2d 494, 497 (App. Div. 1984).
[65] *Millbrook Hunt, Inc. v. Smith*, 249 A.D.2d 281, 282, 670 N.Y.S.2d 907, 908–09 (1998)
[66] *Coker v. Walker*, 2013 WL 1858098, at *3 (Del. Ch. May 3, 2013); *see also Webster v. Ragona*, 776 N.Y.S.2d 347, 350 (App. Div. 2004).

Here, Defendants conveyed an express easement in the Reciprocal Agreement. Section 2.2 of the Reciprocal Agreement states:

> Easement for Repair. Each of the Owners shall have a perpetual easement and right of access to all portions of the Brandywine Town Center Shopping Mall to the extent that such access is necessary or desirable to permit such Owner to maintain, repair or replace any portion of the property which such Owner is responsible to maintain, repair or replace....

In Section 2.2, Holdings conveyed an express easement to the three owners of the other parcels (the "Owners") in the Shopping Center. This is clear because Section 2.2 conveys a right for the Owners to enter Holdings' portion of the Shopping Mall. The conveyance is permanent in nature because the parties specified that it is a "perpetual easement." Finally, the easement is express because Section 2.2 evinces the parties' intent to create a "perpetual easement" and Holdings signed the Reciprocal Agreement.

Section 2.2 of the Reciprocal Agreement conveys a broader easement than the 2006 Declaration. In the 2006 Declaration, Holdings granted an easement to the limited portions of the Shopping Mall that are "Common Facilities"[67] so that the Owners could "install, repair, maintain, remove and replace" fixtures on their own lots, rather than on Holdings' lot. In addition, the 2006 Declaration provided access to the Brandywine Town Center Maintenance Corporation for the purpose of performing work on equipment.[68]

There is no dispute that Holdings did not receive Parkway's consent to enter into the Reciprocal Agreement. The Reciprocal Agreement is recorded as Instrument No. 20160502-0020277 in the land records of New Castle County. The record is clear that Holdings provided a

---

[67] 2006 Dec. at § II.4.3 – Easement in Favor of East Box Lot Owner to Make Certain Repairs, Replacements, and Improvements. The Land and portions of each Building that are Common Facilities are subject to the following easements: (a) The Lot Owner may install, repair, maintain, remove and replace any plumbing, heating, cooling, lighting, or similar fixture or equipment which is part of the Lot . . . .

[68] *Id*. at § II.4.4 – Easement in Favor or Maintenance Corporation. The Brandywine Town Center Maintenance Corporation...shall have an easement of access through the East Box Lots at reasonable hours for the purpose of performing maintenance, repair and replacement.

broader easement than in the 2006 Declaration. Defendants' argument concerning the language regarding conflicts between the 2006 Declaration and the Reciprocal Agreement is too stretched. As Parkway notes, substantially all of the Reciprocal Agreement's new encumbrances have no corresponding provision in the 2006 Declaration—*i.e.*, nothing in conflict with the 2006 Declaration and nothing inconsistent with the 2006 Declaration. As such, the Reciprocal Agreement is the controlling document as to the new easement.[69] Therefore, the express easements into which Holdings entered are "interests" in the Property under Section 9.3(v) of the Loan Agreement and Section 1.2(b) of the Guaranty which, in turn, trigger recourse liability. This point is true as to covenants and other transfers authorized by the Reciprocal Agreement.

### b. Covenants and Insurance Proceeds

Second, the Reciprocal Agreement creates covenants. A covenant is an interest in land.[70] Under New York law, an affirmative covenant runs with the land if the grantor and grantee intended it to run with the land and if the covenant touches and concerns the land.[71]

Parkway alleges that the Reciprocal Agreement creates the following covenants among the Owners:

- To maintain insurance proceeds at specified levels:

  - Section 3.1 – <u>Property Hazard Insurance</u>. Each of the Owners shall maintain for their respective parcels, at all times, and at such Owner's expense, a policy or policies of insurance, insuring the buildings and improvements of such Owner

  - Section 3.2. <u>Public Liability and Property Damage Insurance</u>. Each of the Owners shall secure and maintain for their respective parties, at all times, a policy of public liability and property damages insurance applicable to the

---

[69] *See I.U.N. Am. Inc. v. A.I.U. Ins. Co.*, 896 A.2d 880, 888 (Del. Super. 2006) (providing that when there is no language in both documents that conflicts or is inconsistent, then the second document controlled).

[70] *See* Restatement § 2.1 cmt. a (noting "modern recognition that running covenants are interests in land"); *Feigen v. Green Harbour Beach Club, Inc.*, 204 N.Y.S.2d 381, 389 (Supr. Ct. 1960) ("Current decisions are framed in terms of such restrictions being easements or interests in land...").

[71] *See Neponsit Prop. Owners' Ass'n v. Emigrant Indus. Sav. Bank*, 278 N.Y. 248 (1939); *Nicholson v. 300 Broadway Realty Corp.*, 7 N.Y.2d 240 (1959).

property of such Owner, and at such Owner's expense, in the following minimum amounts: (a) in the case of public liability, One Million Dollars ($1,000,000) per person and Two Million Dollars ($2,000,000) per accident . . . .

- To repair and restore any portion of the Property damaged by casualty as soon practicable even if insurance proceeds are insufficient:

  o Section 4.1. <u>Damage Affecting Construction Located on Only One Parcel</u>. If any portion of the Brandywine Town Center is damaged by fire or other casualty and such damage occurs within the Owner's parcel only..., then any such damages shall be repaired and restored by the Owner of the portion of the Brandywine Town Center Shopping Center in which any such damage occurs...at its sole cost and expense, with due diligence and in as timely a manner as practicable under the circumstances . . . .

  o Section 4.4.1. <u>Cost of Repairs</u>. If the cost and expense of performing any repair and restoration of the Brandywine Town Center Shopping Mall pursuant to Section 4.1...shall exceed the amount of any available insurance proceeds...the excess cost and expense (or the entire amount of such cost and expense, if there are no insurance proceeds) shall be paid by the Damaged Owner. The Damaged Owner shall also pay any deductible amount."

  o Section 4.7. <u>Obligation and Rights to Rebuild</u>. Each Affected Owner shall be obligated to repair and restore its portion of the Brandywine Town Center Shopping Mall regardless of whether or not any insurance proceeds are available.

- To participate in repairing and restoring damage that affect the Property and other Owners' parcels even if it would be more prudent to collect the insurance proceeds and abandon the Property:

  o Section 4.3 – <u>Joint Damage</u>. If the Brandywine Town Center Shopping Mall is damaged by fire or other casualty and the provisions of Section 4.1 do not apply, the affected Owners (each, an "Affected Owner") shall, with diligence and in as timely a manner as practicable under the circumstances, cause the damage to be repaired and the Brandywine Town Center Shopping Mall to be restored and the repair and restoration shall be the joint responsibility of the Affected Owners pursuant to this Section 4.3.

  o Section 4.4.2. <u>Cost of Repairs</u>. If the cost and expense of performing any repair and restoration of the Brandywine Town Center Shopping Mall pursuant to section 4.3 shall exceed the amount of any available insurance proceeds..., the excess cost and expense (or the entire amount of such cost and expense, if there are no insurance proceeds) shall be borne by the Affected Owners in proportion to the Architect Allocated Ratio....

17

o Section 4.7. <u>Obligation and Rights to Rebuild</u>. "Each Affected Owner shall be obligated to repair and restore its portion of the Brandywine Town Center Shopping Mall regardless of whether or not any insurance proceeds are available . . . ."

The Reciprocal Agreement states that all of its provisions "are intended to and shall run with the real property benefited and burdened hereby."[72] The Reciprocal Agreement is a recorded instrument. Here, the statements in the Reciprocal Agreement are covenants that run with the land. This is because the statements are promises relating to the Shopping Mall, which the parties intended to run with the land.

There is no dispute that Holdings did not receive Parkway's consent to enter into the Reciprocal Agreement. The covenants in the Reciprocal Agreement constitute a "transfer" of a legal or equitable right in the Property restricted by Section 5.2.10 of the Loan Agreement.[73] Therefore, the covenants into which Holdings entered are "interests" in the Property under Section 9.3(v) of the Loan Agreement and Section 1.2(b) of the Guaranty which trigger recourse liability.

Parkway argues that Holdings also triggered full recourse by conveying an interest in its insurance proceeds in Section 4.7 of the Reciprocal Agreement. Section 4.7 provides:

> Each Affected Owner shall be obligated to repair and restore its portion of the Brandywine Town Center Shopping Mall regardless of whether or not any insurance proceeds are available. Furthermore, each Affected Owner shall cooperate with the other Affected Owner(s) in connection with any repairs or restoration to the Brandywine Town Center Shopping Mall. If, however, one Affected Owner defaults in the full, faithful and punctual performance of any obligation under this Article IX [*sic*]..., then the other Affected Owner(s) shall have, in addition to all other remedies it may have hereunder or at law or in equity...the right, but not the obligation, if the Defaulting Owner has not commenced the good faith cure of such default...(a) to make any decisions required in connection with the performance of such obligation on behalf of the Defaulting Owner, (b) to actually perform the obligation on behalf of the Defaulting Owner, and (c) subject

---

[72] Reciprocal Agreement Sec. 8.1.
[73] Loan Agreement Sec. 5.2.10(b)(i).

18

to the rights of any holders of mortgages encumbering the Defaulting Owner's property, *to use the Defaulting Owner's insurance proceeds in connection with the performance of any such obligation*. If any Affected Owner defaults in the performance of its obligations under this Article IX [*sic*] as aforesaid, the other Affected Owners are hereby irrevocably appointed attorney-in-fact of the Defaulting Owner...to take any and all steps necessary on behalf of Defaulting Owner to perform the Defaulting Owner's obligations as provided herein.[74]

Parkway notes that insurance proceeds are a form of property. This provision conveys an interest in the Property because it allows other Owners a right to use Defendants' insurance proceeds. It therefore triggers full recourse.

The Reciprocal Agreement directs the purchase of insurance and how proceeds from insurance will be used. In the Mortgage, however, Holdings gave up conveyed all its rights to insurance proceeds. Section 1.1 of the Mortgage addresses what property rights are conveyed by Holdings.[75] Section 1.1(j) provides that Holding has conveyed any right to "[a]ll proceeds in respect of the Property under any insurance policies covering the Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, of damage to the Property."[76]

During argument, the Court came to understand that the Reciprocal Agreement was a document that a potential financier encouraged. That transaction did not close and Parkway is the successor to the Original Lender. Defendants presented the argument that the Reciprocal Agreement and its terms are beneficial to the Property and any transfers under the Reciprocal Agreement are minor. The Court understands these equitable arguments. The Court, however, must enforce the terms of the relevant agreements as agreed to by the parties. The Court finds

---

[74] Reciprocal Agreement Sec. 4.7 (emphasis added).
[75] Mortgage Sec. 1.1.
[76] *Id*. Sec. 1.1(j).

that the Reciprocal Agreement provides for "Transfers" that were not consented to by Parkway.

As such, the "Transfers" violate the Loan Agreement and the Guaranty.

### ii. The Estoppel and Sterling Mortgage Subordinate Financing are not Voluntary Liens Encumbering the Property.

Under Sections 9.3(iv) and 9.3(v) of the Loan Agreement, Holdings triggers full recourse if Holdings does not obtain Parkway's written consent prior to "any Indebtedness or voluntary Lien encumbering the Property" or "any Transfer as required by this Agreement or the Mortgage," respectively. Similarly, under Section 1.2(b) of the Guaranty, Holdings triggers full recourse if Holdings "fails to obtain Parkway's prior written consent to any subordinate financing or other voluntary lien encumbering the Property" or "if Holdings fails to obtain Parkway's prior written consent to any assignment, transfer, or conveyance of the Property or any interest therein as required by the Loan Agreement or the Security Instruments."[77]

Parkway contends that the Sterling Mortgage between Sterling Bank and Colby creates a voluntary lien in the Property and is a transfer of an interest in the Property. Parkway supports its contention that the Sterling Mortgage is a voluntary lien and transfer with the following statements: Colby's secured loans appear on a title report of the Property; the Sterling Mortgage reflects the Property's tax parcel identification number; the Sterling mortgage will be discharged upon foreclosure of Lender's Mortgage; foreclosing the Mortgage will cause Colby to default under its loan from Sterling, jeopardizing Colby's ability to continue generating rents (which are Parkway's collateral); and the Sterling Mortgage gives Sterling Bank a security interest in proceeds from sales or subleases of Colby's leasehold, which are Lender's collateral because such proceeds belong to Borrower under the Ground Lease.[78] Parkway claims that, although

---

[77] Guaranty Sec. 1.2(b).
[78] *See* Alleman Aff. Ex. 25.

Holdings did not sign the Sterling Mortgage, Holdings consented to Colby executing the Mortgage in the Ground Lease Estoppel.[79]

In response, Defendants assert that the Sterling Mortgage encumbers Colby's property rather than the Property, so it is not a voluntary lien or transfer of an interest in the Property. Defendants argue that Parkway consented to the Sterling Mortgage by agreeing that Borrower could grant leases under 10,000 square feet without Parkway's consent.

Parkway responds that Holdings' right to grant non-material leases does not imply a right to authorize mortgages to be recorded against the Property. Parkway contends that the Loan Agreements expressly prohibit unconsented mortgages.[80] The problem with this argument is that the Sterling Mortgage relates to Colby's leasehold interest and nothing more.

The Court finds that Parkway did not consent to the Sterling Mortgage. But that is not the end of the inquiry. The Sterling Mortgage is not a voluntary lien or transfer on the Property. This is because the Sterling Mortgage relates only to Colby's leasehold interest. Section 1.2 of the Sterling Mortgage describes the interest conveyed, "The 'Mortgaged Property' consists of all of [Colby]'s estate, right, title and interest in and to the following described property and property rights, whether now existing or hereafter acquired . . . ." Because the Mortgaged Property only includes Colby's title to the Property, the Sterling Mortgage is not a lien or transfer of the Property. Therefore, the Court holds that the full recourse provision is not triggered by the Sterling Mortgage.

---

[79] Section 3 states: "[Holdings] hereby consents to Colby executing a mortgage or deed of trust in favor of [Sterling National Bank] (the "Mortgage"), encumbering, among other things, [Colby's] interest in Improvements and the Ground Lease. The execution and recordation of the Mortgage including UCC-1 Financing Statements will not constitute a breach or default under the Ground Lease. ground Lessor does not need to obtain any other consents with respect to [Colby's] execution and delivery of the Mortgage."
[80] Loan Agreement Secs. 5.1.20(v), 5.2.2.

### iii.    Holdings did not Transfer Interests in the Red Robin Building.

As noted above, under Section 9.3(v) of the Loan Agreement, Holdings triggers full recourse if Holdings does not obtain Parkway's written consent prior to "any Transfer as required by this Agreement or the Mortgage." Similarly, under Section 1.2(b) of the Guaranty, Holdings triggers full recourse if Holdings "fails to obtain Parkway's prior written consent to any assignment, transfer, or conveyance of the Property or any interest therein as required by the Loan Agreement or the Security Instruments."[81]

Parkway argues that Holdings triggered personal liability by granting to Colby fee title to improvements in the Property. Parkway contends that Holdings made this conveyance in Section 11 of the Estoppel, which states, "[w]hile the [Ground Lease] is in effect, [Colby] holds fee title to the Improvements . . . ."[82] According to Parkway, Holdings originally had title to the Improvements in the Property.

In contrast, Holdings claims that the Ground Lease creates a ground lease in the Property and it is only through the ground lease that Colby owns the improvements on the Property. As a result, Defendants argue that Holdings could not convey its interest in Improvements that Colby already owns. In addition, Defendants note that the Estoppels in 2008, 2015 and 2017 all convey similar interests in the Property. Defendants contends that it would be illogical to convey a fee title to the Improvements three times.

Again, both parties agree that Holdings signed the Estoppels without Parkway's consent. The Court finds that Holdings did not convey an interest in the Property by signing the Estoppel. As per the Ground Lease and Estoppels, the Defendants conveyed the land on which Colby subsequently built a Red Robin restaurant. Colby owned the Red Robin building and any

---

[81] Guaranty at 1.2(b).
[82] Estoppel Sec. 11; 2007 Estoppel Sec. 12; 2015 Estoppel Sec. 12.

improvements for the interim before the expiration of the Ground Lease. Section 11 clarifies that Colby has a fee title to the Improvements on the Property during the term of the Ground Lease. Under the applicable documents, this fee title will revert to Defendants at the termination of the Lease. Section 11 does not convey Defendants' existing interest in the Improvements to Colby except incident to the Ground Lease. Therefore, full recourse is not triggered by the Estoppels.

### iv. Holdings Did Not Admit that it was Insolvent in a Manner that Triggered the Guaranty.

The Court will look to Section 9.3(i)(e) of the Loan Agreement and Section 1.2(b)(i)(E) of the Guaranty to determine whether Holdings triggered recourse liability by "admitting" insolvency. These provisions provide that Holdings triggers the full recourse provision by "admitting, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due."[83]

The parties acknowledge that Defendants provided financial statements and written statements to Parkway asserted that "there are not sufficient funds available to [Holdings] to timely pay [certain] Third Party Expenses." The parties disagree as to the legal significance of these statements.

Financial statements by themselves are not written admissions of insolvency under New York law. In *D.B. Zwirn Special Opportunities Fund, L.P. v. SCC Acquisitions, Inc.*, the New York court found that financial reports indicating that the debtor's liabilities exceeded their cash and assets did not constitute written admissions of insolvency.[84] In that case, the Court also found that failure to pay debts alone was not sufficient to trigger full recourse liability.[85]

---

[83] *See* Loan Agreement Sec. 9.3(i)(e); Guaranty at 1.2(b)(i)(E).
[84] 74 A.D.3d 530, 530 (N.Y. App Div. 1st Dept. 2010).
[85] *Id.*

23

Parkway relies upon financial statements showing a negative equity value, expense notices from Parkway's servicer that there are insufficient funds to timely pay certain third party expenses,[86] and Holdings' statements from the New York Action where Holdings stated "[a]fter stretching terms for the past couple of months, property expenses are now or soon will be past due, and critical services (such as fire phone lines, fire hydrant and riser water service, pest control, security services, utilities, etc.) to operate the Property will soon be at risk of being shut off."[87] These statements relate to the New York Action whereby Holdings seeks to require Parkway to pay operating expenses because Parkway is sweeping all rent funds and refusing to pay for any operating expenses absent court intervention. Holdings alleges that there are sufficient funds, but Parkway is sweeping the funds and not allowing Holdings to pay any bills with the swept funds.

The Court finds that these statements made under that factual scenario, in and of themselves, do not admit insolvency. Instead, Holdings' statements are conditional statements- if Holdings does not receive relief in the New York Action, it will not be able to pay its bills. The Court holds that Holdings has not made a written statement or an unconditional admission that it cannot pay its debts as they become due of the kind that would trigger Section 9.3(i)(e) of the Loan Agreement and Section 1.2(b)(i)(E) of the Guaranty.

### B. The Statute of Limitations Has Not Run on Parkway's Claims.

Defendants argue that the statute of limitations on Parkway's recourse claim has run. When Delaware courts apply the borrowing statute for an action arising from the law of another jurisdiction, Delaware applies the shorter of the statute of limitations.[88] This action raises a

---

[86] Holdings made these statements on April 6, May 6, and June 9 of 2016.
[87] Brandywine Compl. ¶¶ 33-34.
[88] *See* 6 *Del. C.* § 8121.

claim for a breach of the promissory note. There is a six-year statute of limitations for a claim for breach of contract in New York. Delaware has a three year statute of limitations for actions based on contract.[89] The statute of limitations for a breach of contract claim runs from the time of the breach.[90] When "the claim is for payment of a sum of money allegedly owed pursuant to a contract, the cause of action accrues when the [party making the claim] possesses a legal right to demand payment."[91]

Defendants contend that the claim accrued on June 2, 2006 when Original Lender signed the Loan and Note knowing that Holdings owned property, Parcel C-2, that was not part of the Loan or Note. Defendants also claim that Parkway's claims for recourse are barred by the statute of limitations. Parkway argues that claims for breach of contract occur at the time of the breach.

Parkway never accelerated the Debt. So, Parkway's claims to recover the full Debt did not accrue until the Loan matured on July 1, 2016.[92] In addition, Defendants made partial payments on the promissory note through June 2015. These partial payments tolled the statute of limitations.[93] Under New York law, a written acknowledgment of a defaulted contract obligation tolls the statute of limitations, so long as it is signed by the party to be charged, recognizes an existing debt, and contains nothing inconsistent with an intention on the part of the

---

[89] *See* 6 *Del. C.* § 8106(a).
[90] *See Pivotal Payments Direct Corp. v. Planet Payments, Inc.*, 2015 WL 11120934, at *4 (Del. Super. Dec. 29, 2015).
[91] *Hahn Automotive Warehouse, Inc. v. American Zurich Ins. Co.*, 967 N.E.2d 1187, 1190 (N.Y. 2012).
[92] *See Phx. Acquisition Corp.*, 81 N.Y.2d at 140 (dismissal for untimeliness was error; guarantor was not "obligated to pay the whole debt upon the initial default" and lender had not accelerated the debt).
[93] *Bernstein v. Kaplan*, 413 N.Y.S.2d 186, 188 (App. Div. 1979); *see, e.g.*, *Saljanin v. Vuksanaj*, 727 N.Y.S.2d 145 (App. Div. 2001) (statute of limitations on note began running anew on date of partial payment); *Skaneateles Sav. Bank v. Modi Assocs.*, 668 N.Y.S.2d 819, 820 (App. Div. 1998) (reversing dismissal of lender's claim because "periodic payments of principal and interest on the note operated to renew the Statute of Limitations"); *Roth v. Michelson*, 55 N.Y.2d 278, 281 (1982) ("It is a long-standing common-law rule that, if part payment of a debt otherwise outlawed by the Statute of Limitations is made under circumstances from which a promise to honor the obligation may be inferred, it will be effective to make the time limited for bringing an action start anew from the time of such payment.").

debtor to pay it.[94] Defendants signed eight letters between April 6, 2016 and November 4, 2016, in which they acknowledged that "the Debt is currently due and payable in full."[95] In those letters Defendants also "expressly ratified and confirmed" their "respective obligations under the Loan Documents, all of which," "shall continue in full force and effect" and be "enforceable against [Defendants] in accordance with their respective terms."[96] This action was commenced on April 6, 2017. So, Parkway's claims to recover the debt are not time-barred.

In addition, Parkway's claims for recourse liability are not time-barred. As noted above, Defendants triggered the full recourse provisions by signing the Reciprocal Agreement. The Reciprocal Agreement is dated April 29, 2016. So, the statute of limitations had not expired when Parkway filed this action in 2017.

## V. CONCLUSION

For all the foregoing reasons, the Court **GRANTS in part and DENIES in part** Parkway's Motion and **DENIES** Defendants' Motion. The Court further believes that the Brandywine Complaint and the Acadia Complaint each only assert one cause of action. The parties are to contact the Court for an additional hearing regarding the status, if any, of outstanding issues.

**IT IS SO ORDERED**

*/s/ Eric M. Davis*
Eric M. Davis, Judge

cc:     File&ServeXpress

---

[94] N.Y. Gen. Oblig. § 17-101 ("An acknowledgment or promise contained in a writing signed by the party to be charged thereby is the only competent evidence of a new or continuing contract whereby to take an action out of the operation of the provisions of limitations of time for commencing actions under the civil practice law and rules other than an action for the recovery of real property. This section does not alter the effect of a payment of principal or interest.").

[95] Ex. 40 ¶ 3(i)(b).

[96] *Id.* ¶ 3(iii), (vi).